<u>ORAL ARGUMENT HAS NOT BEEN SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Docket Nos. 22-1214, 22-1315

**FOOD & WATER WATCH,**

*Petitioner*,

v.

**FEDERAL ENERGY REGULATORY COMMISSION,**

*Respondent.*
_____

ON PETITION FOR REVIEW OF ORDERS ISSUED BY
FEDERAL ENERGY REGULATORY COMMISSION
_____

BRIEF OF PETITIONER
_____

<u>/s/ *Adam S. Carlesco*</u>
Adam S. Carlesco
D.C. Bar No.:  1601151
202.683.4925
acarlesco@fwwatch.org
Food & Water Watch
1616 P St., NW, Suite 300
Washington, D.C. 20036
*Counsel for Petitioner*

March 14, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner submits the following:

### A. Parties

This case is a Petition for Review. The parties and entities moving to intervene and participate in this proceeding are as follows:

Petitioner is Food & Water Watch.

Respondent is the Federal Energy Regulatory Commission.

Consolidated Edison Company of New York, Inc., and Tennessee Gas Pipeline Company, L.L.C., are intervenors in support of the Federal Energy Regulatory Commission.

### B. Rulings Under Review

The rulings under review are: the Federal Energy Regulatory Commission's Order Issuing Certificate to Tennessee Gas Pipeline Company, L.L.C., dated April 21, 2022 in *Tennessee Gas Pipeline Company, L.L.C.*, referenced at Docket CP20-493-000 and as 179 FERC ¶ 61,041; Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration dated June 21, 2022 in *Tennessee Gas Pipeline Company, L.L.C.*, referenced at CP22-493-001 and as 179 FERC ¶ 62,152; and Order on Rehearing and Denying Stay dated October 24, 2022 in *Tennessee Gas Pipeline Company, L.L.C.*, referenced at CP22-493-001 and as 181 FERC ¶ 61,051.

**C. Related Cases**

This matter has not previously been before this Court or any other court, as defined in D.C. Circuit Rule 28(a)(1)(c). Petitioner Food & Water Watch is aware that *Sierra Club v. Federal Energy Regulatory Commission*, D.C. Circuit Case No. 22-1233, raises issues related to the failure of the Federal Energy Regulatory Commission to consider New York State's Climate Leadership and Community Protection Act when approving gas infrastructure projects. Petitioner is also aware that *NY/NJ Baykeeper v. Federal Energy Regulatory Commission*, D.C. Circuit Case No. 20-1211, raises issues related to the failure of the Commission to consider the foreseeable upstream and downstream impacts of gas pipeline construction on the New York City metropolitan area in violation of the National Environmental Policy Act. However, that case has been held in abeyance since July 2020.

## <u>RULE 26.1 CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to D.C. Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, Food & Water Watch, Petitioner in the above-captioned case, submits this Corporate Disclosure Statement.

Food & Water Watch is a 501(c)(3) not-for-profit organization founded in 2005 to ensure access to clean drinking water, safe and sustainable food, and a livable climate. Food & Water Watch has no parent companies, and there are no publicly held corporations that have a ten percent or greater ownership interest in Food & Water Watch.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................viii

GLOSSARY ......................................................................................xv

JURISDICTIONAL STATEMENT ................................................1

STATEMENT OF THE ISSUES ....................................................3

STATUTES AND REGULATIONS ..............................................4

INTRODUCTION............................................................................4

STATEMENT OF THE CASE .......................................................6

STATEMENT OF FACTS...............................................................8

       A.  The East 300 Project ....................................................8

       B.  Project Application and Petitioner Intervention .........................9

       C.  The Commission's Environmental Review ..................................9

       D.  Certificate Order and Rehearing Request ....................................13

SUMMARY OF LEGAL ARGUMENT .........................................19

STANDING.....................................................................................21

STANDARD OF REVIEW .............................................................23

ARGUMENT ..................................................................................26

    I.     THE COMMISSION FAILED TO FULLY CONSIDER
           INDIRECT AND CUMULATIVE ENVIRONMENTAL
           IMPACTS AND THEIR SIGNIFICANCE AS REQUIRED BY
           NEPA .......................................................................................26

A. The Commission Failed to Consider Reasonably Foreseeable Indirect and Cumulative Upstream Effects....................................29

    i. *The Project will have reasonably foreseeable and causally connected indirect upstream environmental impacts that the Commission must consider* ......................29

    ii. *The Commission had sufficient information to consider upstream impacts*................................................................33

    iii. *If the Commission believed it lacked information about upstream impacts, it was required to request more detailed information* ..........................................................36

B. The Commission Failed to Consider Reasonably Foreseeable Indirect and Cumulative Downstream Air Pollution ....................39

C. The Commission Failed to Consider the Significance of the Project's Indirect and Cumulative Impacts on Climate Change...44

II. THE COMMISSION VIOLATED THE NGA WHEN IT FAILED TO CONSIDER ALL FACTORS BEARING ON THE PUBLIC INTEREST, INCLUDING STATE AND LOCAL CLIMATE LAWS, IN ITS ANALYSIS OF PROJECT NEED..........................48

A. The Commission Failed to Consider New York's Climate Leadership and Community Protection Act's Emissions Reduction Requirements ............................................................50

B. The Commission Failed to Consider New York City's Prohibition on Gas Connections for New and Renovated Buildings.......................................................................54

III. THE PROPER REMEDY IS VACATUR OF THE CERTIFICATE ORDER AND REMAND .......................................56

CONCLUSION AND REFLIEF REQUESTED .............................................57

CERTIFICATE OF COMPLIANCE ..............................................................59

vi

CERTIFICATE OF SERVICE..............................................................60

ADDENDUM...................................................................................61

## TABLE OF AUTHORITIES

*Authorities upon which Petitioner chiefly relies are marked with asterisks.

## Cases

*Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*,
    360 U.S. 378 (1959).................................................................48

*Canadian Ass'n of Petroleum Producers v. Fed. Energy Regul. Comm'n*,
    254 F. 3d 289 (D.C. Cir. 2001) ...............................................56

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971).................................................................56

*Danskammer Energy, L.L.C., v. N.Y.S. Dep't of Env't Conserv.*,
    2022 NYLJ LEXIS 1213 (N.Y. Sup. Ct. 2022) ......................51

*Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*,
    753 F.3d 1304 (D.C. Cir. 2014) ……………………………….. 34, 42

*Diné Citizens Against Ruining Our Env't v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) ...............................................40

*District of Columbia v. U.S. Dep't of Agric.*,
    96 F. Supp. 3d 213 (D.D.C. 2020) .........................................45

*EarthReports, Inc. v. Fed. Energy Regul. Comm'n*,
    828 F.3d 949 (D.C. Cir. 2016) ...............................................27

*Env't Def. Fund v. Fed. Energy Regul. Comm'n*,
    2 F.4th 953 (D.C. Cir. 2021) ..................................................50

*Fed. Commc'ns Comm'n v. NextWave Personal Commc'ns. Inc.*,
    537 U.S. 293 (2003)................................................................56

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) …………………………………………… 49, 54

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp*,
    365 U.S. 1 (1961)....................................................................39

*Food & Water Watch v. Fed. Energy Regul. Comm'n,*
    28 F.4th 277 (D.C. Cir. 2022)……………………………22, 36, 39, 44

*Found. on Econ. Trends v. Heckler,*
    756 F.2d 143 (D.C. Cir. 1985) ...............................................24

*Greater Yellowstone Coal. v. Kempthorne,*
    577 F. Supp. 2d 183 (D.D.C. 2008) ........................................57

*Gresham v. Azar,*
    950 F.3d 93 (D.C. Cir. 2020) .................................................45

*Humane Soc'y of U.S. v. Johanns,*
    520 F. Supp. 2d 8 (D.D.C. 2007) ...........................................56

*Birckhead v. Fed. Energy Regul. Comm'n,*
    925 F.3d 510 (D.C. Cir. 2019) ......................................... 32, 37

*Mid States Coal. For Progress v. Surface Transp. Bd.,*
    345 F.3d 520 (8th Cir. 2003)..................................................37

*Minisink Residents for Env't Pres. & Safety v. Fed. Energy Regul. Comm'n,*
    762 F.3d 97 (D.C. Cir. 2014)……………………………………49, 55

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)…………………………………… 24, 39, 44, 48, 50

*NAACP v. Fed. Power Comm'n,*
    425 U.S. 662 (1976)...............................................................49

*PPL Wallingford Energy, L.L.C. v. Fed. Energy Regul. Comm'n,*
    419 F.3d 1194 (D.C. Cir. 2005) .............................................55

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
    374 F.3d 1209 (D.C. Cir. 2004) .............................................34

*Pub. Emps. For Env't Responsibility v. U.S. Fish & Wildlife Serv.,*
    189 F. Supp. 3d 1 (D.D.C. 2016) ...........................................57

*Pub. Utils. Comm'n of Cal. v. Fed. Energy Regul. Comm'n*,
  900 F.2d 269 (D.C. Cir. 1990) ...............................................................49

*Reed v. Salazar*,
  744 F. Supp. 2d 98 (D.D.C. 2010) .........................................................56

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)................................................................................27

*Scientists' Inst. for Pub. Info., Inc. v. U.S. Atomic Energy Comm'n*,
  481 F.2d 1079 (D.C. Cir. 1973) .............................................................38

*Silva v. Lynn*,
  482 F.2d 1282 (1st Cir. 1973) ................................................................24

*Sierra Club v. Env't Prot. Agency*,
  292 F.3d 895 (D.C. Cir. 2002) ...............................................................21

*Sierra Club v. Fed. Energy Regul. Comm'n*,
  827 F.3d 36 (D.C. Cir. 2016). ................................................................21

*\*Sierra Club v. Fed. Energy Regul. Comm'n*,
  867 F.3d 1357 (D.C. Cir. 2017)....5, 23, 24, 27, 28, 32, 33, 42, 43, 44, 57

*Sithe/Independence Power Partners, L.P. v. Fed. Energy Regul. Comm'n*,
  165 F.3d 944 (D.C. Cir. 1999) ...............................................................23

*Tenneco Gas v. Fed. Energy Regul. Comm'n*,
  969 F. 2d 1187 (D.C. Cir. 1992)…………………………………25, 50

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) .............................................................56

*Vecinos para el Bienestar de la Comunidad Costera v. Fed. Energy Reg. Comm'n*,
  6 F.4th 1321 (D.C. Cir. 2021) …………………………………28, 44, 48

*WildEarth Guardians v. Bernhardt*,
  2021 U.S. Dist. LEXIS 20792 (D. Mont. 2021) ....................................40

*WildEarth Guardians v. Zinke,*
    2019 U.S. Dist. LEXIS 30357 (D. Mont. 2019) .....................................41

*Wisconsin Valley Improvement Co. v. Fed. Energy Regul. Comm'n,*
    236 F.3d 738 (D.C. Cir. 2001) ................................................................43

## Statutes

5 U.S.C. § 706(2)(A) .................................................................................23

15 U.S.C. §§ 717–717z ........................................................................... 1

15 U.S.C. § 717f(c)(1)(A) ....................................................................... 1

15 U.S.C. § 717f(e) ………………………………………………… 5, 48, 50

15 U.S.C. § 717r ..................................................................................... 1

15 U.S.C. §717r(a) ................................................................................. 2

15 U.S.C. §717r(b) ………………………………………………… 2, 7, 24, 50

42 U.S.C. § 4321–4370j ………………………………………………. 5, 26

42 U.S.C. § 4332(2)(C) .........................................................................26

42 U.S.C. §§ 7401–7515 ........................................................................42

42 U.S.C. §§ 7506 ...................................................................................43

N.Y. Env't Conserv. Law § 75-0101 to 75-0119 …………………3, 50, 51

N.Y. Env't Conserv. Law § 75-0107(1) .................................................51

## Regulations

18 C.F.R. § 385.214 ………………………………………………….. 2, 6

18 C.F.R. § 385.713(b)........................................................................ 2

40 C.F.R. § 1500.1(b).........................................................................26

40 C.F.R. § 1508.1(g) .........................................................................26

40 C.F.R. § 1508.1(g)(2) .....................................................................27

40 C.F.R. § 1508.1(g)(3) .....................................................................27

N.Y.C. Admin. Code § 24-177.1 ……………………………………… 3, 54

**Federal Energy Regulatory Commission Decisions and Policies**

*Certification of New Interstate Natural Gas Facilities,*
    178 FERC ¶ 61,107 (Feb. 18, 2022) .....................................................45

*Consideration of Greenhouse Gas Emissions in Natural Gas Infrastructure Project*
    *Reviews*, 178 FERC ¶ 61,108 (Feb. 18, 2022) ……………………45, 49

*N. Nat. Gas. Co.*,
    174 FERC ¶ 61,189 (2021) ..................................................................47

*Tennessee Gas Pipeline Co., L.L.C.*,
    139 FERC ¶ 61,161 (May 29, 2012)....................................................34

*Tennessee Gas Pipeline Co., L.L.C.*,
    179 FERC ¶ 61,041 (April 21, 2022) …………………………………
    …………………………….. ii, 6, 8, 13, 14, 16, 37, 38, 45, 47, 48, 49, 52

*Tennessee Gas Pipeline Co., L.L.C.*,
    179 FERC ¶ 61,152 (June 21, 2022) ………………………………. ii, 7

*Tennessee Gas Pipeline Co., L.L.C.*,
    181 FERC ¶ 61,051 (Oct. 24, 2022) …………………………………
    …………………… ii, 7, 15, 16, 17, 18, 31, 32, 33, 37, 38, 40, 42, 43, 44

*Transcontinental Gas Pipe Line Co., L.L.C.*,
    182 FERC ¶ 61,006 (Jan. 11, 2023).....................................................46

*Transwestern Pipeline Co.*,
　　36 F.P.C. 176, 185 (1966) .......................................................39

## Other Authorities

Council on Env't Quality, *Nat'l Env't Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change,* 88 Fed. Reg. 1196 (Jan. 9, 2023) ......................................................................33

Fed. Energy Regul. Comm'n, *FERC Updates Policies to Guide Natural Gas Project Certifications* (Feb, 17, 2022), https://www.ferc.gov/news-events/news/ferc-updates-policies-guide-natural-gas-project-certifications ........................................................................... 4

FED. R. EVID. 201(b)………………………………………………… 5

Iroquois Gas Transmission System, L.P.*,* Supplemental Filing, Docket No. CP20-48-000, Doc. Accession No. 20211015-5198 (Oct. 15, 2021)...............36

Kinder Morgan, *Operations,* https://www.kindermorgan.com/Operations/Natural-Gas/Index ............................................................................16

Kinder Morgan, *Tennessee Gas Pipeline Places 300 Line Project in Service* (Nov. 1, 2011), https://ir.kindermorgan.com/news/news-details/2011/Tennessee-Gas-Pipeline-Places-300-Line-Project-in-Service/default.aspx .............34

N.Y.S. Climate Action Council, *Scoping Plan: Full Report* (Dec. 2022), https://climate.ny.gov/-/media/project/climate/files/NYS-Climate-Action-Council-Final-Scoping-Plan-2022.pdf...................................................52

N.Y.S. Dep't of Env't Conserv., Comments Opposing Extension Request & Motion to Reopen Record, Docket No. CP15-115, Doc. Accession No. 20220216-5191 (Feb. 16, 2022)…………………………………… 51, 52

N.Y.S. Dep't of Env't Conserv., Comments on the Updated Policy Statement on Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000, Doc. Accession No. 20220425-5369 (Apr. 25, 2022) ………. 51, 52

N.Y.S. Dep't of Env't Conserv., *NYSDEC 2022 Statewide GHG Emission Inventory: Appendix*, https://www.dec.ny.gov/docs/administration_pdf/ghgappxclcpaemissfctrs22.pdf ...............................................................................36

We Energies, *Valley Power Plant* (May 2016), https://www.we-energies.com/company/pdf/ValleyPP.pdf.................................................43

U.S. Bureau of Transp. Statistics, *U.S. Oil and Gas Pipeline Mileage*, https://www.bts.gov/content/us-oil-and-gas-pipeline-mileage ...............16

U.S. Energy Info. Admin., *Production Decline Curve Analysis in the Annual Energy Outlook 2022*, https://www.eia.gov/analysis/drilling/curve_analysis/ ………………………………………………………………………… 30

U.S. Env't Prot. Agency, *Support Center for Regulatory Atmospheric Modeling*, https://www.epa.gov/scram....................................................................42

# <u>GLOSSARY</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| Certificate | Certificate of Public Convenience and Necessity |
| Climate Act | New York Climate Leadership and Community Protection Act |
| Commission | Federal Energy Regulatory Commission |
| ConEd | Consolidated Edison Company of New York, Inc. |
| EPA | United States Environmental Protection Agency |
| NGA | Natural Gas Act |
| NEPA | National Environmental Policy Act |
| Project | East 300 Upgrade Project |
| Petitioner | Food & Water Watch |
| Tennessee | Tennessee Gas Pipeline Company, L.L.C. |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Docket Nos. 22-1214, 22-1315

**FOOD & WATER WATCH,**

*Petitioner*,

v.

**FEDERAL ENERGY REGULATORY COMMISSION,**

*Respondent*.

_____

ON PETITION FOR REVIEW OF ORDERS ISSUED BY
FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF OF PETITIONER FOOD & WATER WATCH**

_____

**<u>JURISDICTIONAL STATEMENT</u>**

The Natural Gas Act, 15 U.S.C. §§ 717–717z, requires a Certificate of
Public Convenience and Necessity from the Federal Energy Regulatory
Commission for the construction of facilities used in the transportation of natural
gas. *Id.* § 717f(c)(1)(A). Section 717r of the Natural Gas Act grants this Court
jurisdiction over this Petition for Review. *Id.* § 717r. On July 31, 2020, Petitioner
Food & Water Watch filed a motion to intervene in the Federal Energy Regulatory
Commission proceeding for Tennessee Gas Pipeline Company, L.L.C.'s East 300
Upgrade Project, J.A.-__, which was granted by operation of law. *See* 18 C.F.R. §§

1

385.214(a)(3)–(c) (providing for grant of party status if no opposition is filed within fifteen days of a timely motion to intervene). On May 22, 2022, within thirty days of the Federal Energy Regulatory Commission's Order issuing a Certificate of Public Convenience and Necessity for the East 300 Upgrade Project, Petitioner Food & Water Watch filed a timely petition for rehearing. *See id*. § 385.713(b); J.A.-__. On June 21, 2022, the Federal Energy Regulatory Commission denied rehearing by operation of law, thus rendering the Order issuing the Certificate of Public Convenience and Necessity final for judicial review under the Natural Gas Act. *See* 15 U.S.C. § 717r(a). Petitioner Food & Water Watch timely filed a Petition for Review (Case No. 22-1214) on August 19, 2022, within sixty days of the Federal Energy Regulatory Commission's denial of rehearing. *See id.* § 717r(b). On October 21, 2022, the Federal Energy Regulatory Commission issued its substantive Order on Rehearing and Denying Stay. Petitioner Food & Water Watch timely filed a second Petition for Review (Case No. 22-1315) on December 13, 2022, within sixty days of the Federal Energy Regulatory Commission's substantive order. *See id*. Both cases before this Court were subsequently consolidated into this proceeding.

## STATEMENT OF THE ISSUES

1.     Did the Federal Energy Regulatory Commission violate the Administrative Procedure Act, the National Environmental Policy Act, and the Council on Environmental Quality's regulations by conducting an improperly narrow review of the East 300 Upgrade Project's indirect and cumulative upstream environmental impacts, and failing to consider the significance of those impacts, prior to issuing a Certificate of Public Convenience and Necessity for the Project?

2.     Did the Federal Energy Regulatory Commission violate the Administrative Procedure Act and the National Environmental Policy Act by failing to assess and consider the East 300 Upgrade Project's indirect and cumulative downstream air pollution impacts, including on ozone pollution in Westchester County, New York, and failing to consider the significance of downstream environmental impacts, prior to issuing a Certificate of Public Convenience and Necessity for the Project?

3.     Did the Federal Energy Regulatory Commission violate the Administrative Procedure Act and the Natural Gas Act by refusing to consider all factors bearing on the public interest in its analysis of public convenience and necessity for the East 300 Upgrade Project, including the New York Climate Leadership and Community Protection Act, N.Y. ENV'T CONSERV. LAW §§ 75-0101 to 75-0119, and New York City's prohibition on new gas hookups, N.Y.C. Admin. Code § 24-177.1?

3

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in the Addendum to this brief.

## INTRODUCTION

Petitioner Food & Water Watch ("Petitioner") challenges the Federal Energy Regulatory Commission's ("Commission") decision to issue a Certificate of Public Convenience and Necessity ("Certificate") to Tennessee Gas Pipeline Company, L.L.C. ("Tennessee") for its East 300 Upgrade Project ("Project"), which involves the construction and/or expansion of three fossil gas-powered compressor stations in Pennsylvania and New Jersey to serve downstream local distribution in the New York City metropolitan area. The Project would result in significant indirect and cumulative impacts—both upstream and downstream—through further entrenchment of fossil fuel reliance over the lifespan of the infrastructure. The Project would also hinder the ability of New York State and New York City to meet binding greenhouse gas emissions reduction requirements.

Despite claims by the Commission that it would reform its natural gas certification process after adverse court decisions, *see*, *e.g.*, Press Release, Fed. Energy Regul. Comm'n, *FERC Updates Policies to Guide Natural Gas Project Certifications* (Feb, 17, 2022), https://www.ferc.gov/news-events/news/ferc-

updates-policies-guide-natural-gas-project-certifications;[1] *Sierra Club v. Fed. Energy Regul. Comm'n,* 867 F.3d 1357 (D.C. Cir. 2017) ("*Sierra Club*"), the Commission once again refused to adequately consider the reasonably foreseeable indirect and cumulative effects of its approval of the Project as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370j. The Commission also refused to consider the effect of state and local laws forcing greenhouse gas emissions reductions and gas usage reductions when determining the future need for the Project, thus failing to consider all relevant factors bearing on the public interest as required by the Natural Gas Act ("NGA") prior to issuing the Certificate. *See* 15 U.S.C. § 717f(e).

The Commission's approval of the Project is therefore arbitrary and capricious and violates the Administrative Procedure Act ("APA"), NEPA, and the NGA. Accordingly, Petitioner asks this Court to vacate the Commission's orders below and remand the matter to the agency.

---

[1] To the extent Petitioner cites publicly available information herein, it notes that this Court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the . . . court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

## STATEMENT OF THE CASE

On June 30, 2020, Tennessee filed an application with the Commission under Section 7 of the NGA for a certificate to construct, install, modify, operate, and maintain certain natural gas compression facilities in Susquehanna County, Pennsylvania and Sussex and Passaic Counties, New Jersey, in order to provide additional methane gas to a single local distribution company in Westchester County, New York. J.A.-__. On July 31, 2020, Petitioner filed a motion to intervene in opposition to the Project, J.A.-__, which was granted by operation of law. *See* 18 C.F.R. § 385.214(c).

On February 19, 2021, the Commission issued its Environmental Assessment for the Project, J.A.-__, and on March 22, 2021, Petitioner commented on its shortcomings. J.A.-__. On May 27, 2021, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement, J.A.-__, and on July 2, 2021, the Commission released its Draft Environmental Impact Statement. J.A.-__. Petitioner submitted comments on the Draft Environmental Impact Statement on August 23, 2021, J.A.-__, and the Commission issued its Final Environmental Impact Statement on September 24, 2021. J.A.-__.

On April 21, 2022, the Commission issued its Order granting a Certificate to Tennessee for the Project. *Tennessee Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041 (Apr. 21, 2022) ("Certificate Order"), J.A.-__. On May 19, 2022, Petitioner filed a

rehearing request raising concerns at issue in this case, J.A.-__, and on June 21, 2022, the Commission denied Petitioner's request by operation of law. *Tennessee Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,152 (June 21, 2022) ("Procedural Rehearing Order"), J.A.-__. The Procedural Rehearing Order rendered the Commission's action final for purposes of judicial review under the NGA. *See* 15 U.S.C. § 717r(b). Petitioner then appealed to this Court as case number 22-1214.

On October 24, 2022, the Commission issued its Order on Rehearing and Denying Stay. *Tennessee Gas Pipeline Co., L.L.C.*, 181 FERC ¶ 61,051 (Oct. 24, 2022) ("Substantive Rehearing Order"), J.A.-__. Petitioner then appealed to this Court as case number 22-1315. Both dockets were subsequently consolidated into this proceeding.

## STATEMENT OF FACTS

### A. The East 300 Upgrade Project

The East 300 Upgrade Project will provide an additional 115,000 Dekatherms per day of methane gas to be transported on Tennessee's existing 300 Line transmission system. Certificate Order at P. 3, J.A.-__. To accomplish this expansion, Tennessee proposes to construct a new 19,000 horsepower electric-driven compressor unit in Passaic County, New Jersey, and install 300 feet of thirty-six inch-diameter unit piping and 1,400 feet of forty-two inch-diameter suction and discharge piping connecting the compressor station to Tennessee's 300 Line. *Id.* at P. 4, J.A.-__. Tennessee also proposes to expand two existing compressor stations. *Id*. at P. 5, J.A.-__. The first, in Susquehanna County, Pennsylvania, will include the installation of a new 11,107 horsepower gas-fired turbine compressor unit, and the second, in Sussex County, New Jersey, will include the installation of a new 20,500 horsepower gas-fired turbine compressor unit. *Id.*

Prior to submitting its application for the Project, Tennessee entered into a twenty-year binding precedent agreement with Consolidated Edison Company of New York, Inc. ("ConEd"), a utility company that delivers natural gas to customers in New York City and Westchester County, for the full 115,000 Dekatherms per day of gas to be provided by the Project. *Id*. at P. 6, J.A.-__. ConEd indicated that

its purpose for the precedent agreement is to expand its gas distribution service to new customers. *Id.*

## B. Project Application and Petitioner Intervention

On June 30, 2020, Tennessee submitted an application to the Commission seeking a Certificate for the Project. Application for a Certificate of Public Convenience and Necessity (June 30, 2020), J.A.-__. On July 15, 2020, the Commission issued a Notice of Application alerting the public to the proceeding. Notice of Application (July 15, 2020), J.A.-__. Alarmed by the anticipated impact of an unnecessary project on the local communities, the region, and the climate, Petitioner urged the Commission to require a thorough analysis of indirect and cumulative environmental impacts associated with the Project, as well as the significance of those impacts on climate change. Food & Water Watch, Motion to Intervene (July 31, 2020) ("Motion to Intervene"), J.A.-__. Petitioner also urged the Commission to consider New York's Climate Leadership and Community Protection Act ("Climate Act") when reviewing the Project's purported need. Motion to Intervene, J.A.-__.

## C. The Commission's Environmental Review

On August 13, 2020, the Commission issued a Notice of Intent to Prepare an Environmental Assessment under NEPA. Notice of Intent to Prepare an Environmental Assessment & Request for Comments on Environmental Issues

(Aug. 13, 2020), J.A.-__. Petitioner submitted additional comments that reiterated the concerns raised in its Motion to Intervene, including the need for the Commission to consider the Climate Act. *See* Food & Water Watch, Comments on the Scope of NEPA Review (Sept. 14, 2020), J.A.-__. Notably, the U.S. Environmental Protection Agency ("EPA") shared a number of Petitioner's concerns, including the need for "a general conformity applicability analysis" for all "applicable pollutants and precursors" of the Project under the Clean Air Act. *See* EPA, Comments on the Notice of Intent to Prepare an Environmental Assessment (Sept. 2, 2020), J.A.-__.

On February 19, 2021, the Commission issued an Environmental Assessment which projected direct air pollution near compressor station sites but did not review projected indirect upstream or downstream effects of the Project. Rather, the Commission staff stated that "[u]pstream and downstream impacts are not within the scope of this [Environmental Assessment]." Environmental Assessment at 12, 54–59 (Feb. 19, 2021), J.A.-__. The Commission also failed to consider relevant New York state and local law requirements, even though the Project would serve only a single downstream local distribution network in New York.

On March 22, 2021, Petitioner commented on the shortcomings of the Commission's Environmental Assessment. Food & Water Watch, Comments on

the Environmental Assessment (Mar. 22, 2021), J.A.-__. Specifically, Petitioner

raised the Commission's failure to consider the Project's reasonably foreseeable

indirect effects and emissions, its downstream air pollution impacts, the

significance of its greenhouse gas emissions, and its conflicts with New York state

and local laws.

On May 27, 2021, the Commission issued a Notice of Intent to Prepare an

Environmental Impact Statement. Notice of Intent to Prepare an Environmental

Impact Statement (May 27, 2021), J.A.-__. The Commission released its Draft

Environmental Impact Statement on July 2, 2021. Draft Environmental Impact

Statement (July 2, 2021), J.A.-__. On August 23, 2021, Petitioner submitted

comments on the Draft Environmental Impact Statement, again raising the same

ongoing deficiencies in the Commission's analysis. Food & Water Watch,

Comments on the Draft Environmental Impact Statement (Aug. 23, 2021), J.A.-__.

EPA also commented on the Draft Environmental Impact Statement,

recommending that the Commission incorporate a more detailed analysis of the

"proposed project's need," including consideration of carbon lock-in and potential

stranded assets when New York's shift away from reliance on fossil gas renders

the Project's infrastructure obsolete. EPA, Comments on the Draft Environmental

Impact Statement (Aug. 23, 2021), J.A.-__. EPA also advised the Commission to

assess the Project's consistency with recent federal, state, and other greenhouse gas

11

emission reduction goals, and to consider upstream greenhouse gas emission estimates. *Id.*

On September 24, 2021, the Commission issued its Final Environmental Impact Statement. Final Environmental Impact Statement (Sept. 24, 2021), J.A.-__. While the final document contained a calculation of total downstream greenhouse gas emissions and a comparison to total state emissions levels, it failed to address several issues repeatedly raised by Petitioner, including the Project's reasonably foreseeable indirect upstream impacts and downstream localized air pollution, the significance of the Project's greenhouse gas emissions on climate change, and the impact of New York state and local laws on project need.

On November 1, 2021, EPA submitted additional comments on the Final Environmental Impact Statement expressing "strong concerns over incomplete greenhouse gas emissions estimates and lack of disclosure of potential climate damages." EPA, Comments on the Final Environmental Impact Statement (Nov. 1, 2021), J.A.-__. Rather than approve certification, EPA strongly recommended the Commission postpone any decision on the proposed action and similar pending applications until the Commission updated its policy for identification and consideration of greenhouse gas emissions. *Id.* Ultimately, EPA determined that the Final Environmental Impact Statement contained insufficient information to

assess potentially significant environmental impacts and was inadequate to comply with NEPA. *Id.*

### D. Certificate Order and Rehearing Request

On April 21, 2022, the Commission granted a Certificate to Tennessee for the Project, over the objections of Petitioner and EPA. *Tennessee Gas Pipeline Co., L.L.C.*, 179 FERC ¶ 61,041 (April 21, 2022), J.A.-___. The Commission did not analyze the full extent of indirect and cumulative upstream impacts of the Project, claiming its approval is not the immediate cause of such impacts, nor are such impacts reasonably foreseeable. Certificate Order at PP. 55–57, J.A.-___. Additionally, the Commission failed to address the lack of environmental review for indirect and cumulative downstream air pollution impacts. *Id.* at PP. 41–48, J.A.-___.

The Commission also failed to consider the significance of the Project's impacts on climate change, claiming that it was unable to make such a determination. *Id.* at PP. 34, 49, J.A.-___. Although the Commission used the social cost of greenhouse gases methodology in the Project's environmental review, it refused to use such estimates "to make any finding or determination regarding either the impact of the project's [greenhouse gas] emissions or whether the project is in the public convenience and necessity." *Id.* at P. 60, J.A.-___. The Commission also refused to consider the significance of the Project's impacts on climate

13

change, because it was separately "conducting a generic proceeding to determine

whether and how the Commission will conduct significance determinations going

forward." *Id.* at P. 49, J.A.-\_\_. The Commission provided no estimate of when

such a proceeding would be concluded.

Chairman Glick disagreed with the Commission's conclusion that the

significance of the Project's impacts on climate change were categorically

indeterminable, stating in a concurring opinion that

> deciding on the significance of [greenhouse gas] impacts in
> this proceeding should have been an easy call. The record
> reflects that this project would result in downstream
> emissions of over 1.7 million metric tons per year, based
> on Tennessee's proposed 77% utilization rate; the
> downstream figure balloons to 2.2 million metric tons per
> year if we assume that all of the project's capacity will be
> combusted. Accordingly, I would have found this project's
> [greenhouse gas] emissions to be significant. Even setting
> aside the volume of emissions of this particular project,
> there is nothing about [greenhouse gas] emissions or their
> contribution to climate change that prevents this agency
> from making determinations about their significance.

Certificate Order at P. 7 (Chairman Glick, concurring), J.A.-\_\_.

The Commission also failed to adequately consider how New York state and

local laws requiring greenhouse gas emissions reductions would impact future

project need. Certificate Order at P. 17, J.A.-\_\_.

On May 19, 2022, Petitioner sought rehearing, raising several violations of

NEPA and the NGA including, *inter alia*: the Commission's failure to

meaningfully consider the reasonably foreseeable indirect upstream impacts of the Project; its failure to consider the indirect downstream air pollution on Westchester County, New York, an area already in noncompliance with the Clean Air Act's National Ambient Air Quality Standards; its failure to analyze the significance of the Project's emissions on climate change; and its failure to consider relevant state and local laws requiring drastic greenhouse gas emissions reductions when determining project need. *See generally*, Food & Water Watch Rehearing Request (May 19, 2022) ("Rehearing Request"), J.A.-__; Substantive Rehearing Order at P. 14, J.A.-__ (recognizing arguments Petitioner advanced in seeking rehearing).

Concerning the Commission's refusal to consider the reasonably foreseeable upstream impacts of the Project, as required by NEPA and its implementing regulations, Petitioner stated that

> the record before the Commission was sufficient to allow for full consideration of reasonably foreseeable indirect upstream [greenhouse gas] emissions from the Project. Moreover, [the Commission] is obligated to seek additional information needed to fully analyze these effects. [The Commission] nonetheless failed to fully account for these effects, in violation of NEPA.

Rehearing Request at 9, J.A.-__. However, the Commission determined that "the indirect effects associated with upstream production of gas are not a reasonably foreseeable impact of this project" and refused to consider the upstream emissions "caused by delivery of gas into the Tennessee system." Substantive Rehearing

Order at P. 27, J.A.-__.  In reaching this determination, the Commission claimed

the source of the gas "is currently unknown," *id*. at P. 27, J.A.-__, despite

Tennessee's own maps showing that the Project would feed directly from the

Marcellus and Utica shales of Pennsylvania. Rehearing Request at 10, J.A.-__. The

Commission never requested that Tennessee provide further information on

sourcing or inquire to its parent company, Kinder Morgan,[2] to identify the origin of

the gas being transported or the anticipated number of wells required to supply the

Project's additional gas capacity for the duration of the infrastructure's lifecycle.

*See* Certificate Order at P. 57, J.A.-__; Substantive Rehearing Order at P. 27, J.A.-

__. In fact, the Commission waived compliance with its own regulation that

requires an applicant to provide information on production areas accessible to

pipelines. Substantive Rehearing Order at P. 27 n.74, J.A.-__.

Petitioner also raised concerns with the Commission's analysis of reasonably

foreseeable downstream air emissions in Westchester County, New York—a

county in noncompliance with the Clean Air Act's National Ambient Air Quality

Standards for ozone. Rehearing Request at 12–13, J.A.-__. While the Commission

---

[2] Tennessee is a wholly-owned subsidiary of Kinder Morgan, the largest gas
pipeline company in the United States, which owns or operates over 70,000 miles
of gas pipeline—nearly a third of all U.S. gas transmission—and moves over forty
percent of U.S. natural gas through its pipes. *See* Kinder Morgan, *Operations,*
https://www.kindermorgan.com/Operations/Natural-Gas/Index; U.S. Bureau of
Transp. Statistics, *U.S. Oil and Gas Pipeline Mileage*,
https://www.bts.gov/content/us-oil-and-gas-pipeline-mileage.

acknowledged that the "increase in natural gas combustion due to the project will likely result in some increase in emissions of ozone precursors," it refused any further analysis because "[d]eveloping an approximate range of ozone precursors … for the volume of gas transmitted through the project … does not provide any degree of certainty as to those emissions." Substantive Rehearing Order at PP. 29–30 J.A.-__.

Petitioner further objected to the Commission's failure to determine the significance of the Project's impacts on climate change, Rehearing Request at 13–16, J.A.-__, and again, the Commission refused to do so. Substantive Rehearing Order at P. 37, J.A.-__. Despite acknowledging that it "has previously assessed the 'significance' of [greenhouse gases]," the Commission provided no justification for its failure to do so here, other than that it would be addressing this issue in a future policy statement. *Id*. at P. 34 n.101, J.A.-__. However, the Commission issued an interim policy statement last year stating definitively that it can assess the significance of greenhouse gas emissions.[3] *Id.* Because of its repeated failure to consider significance, Chairman Glick once more wrote in his concurring opinion that "the Commission could have—and, in my view, should have—assessed the

---

[3] The Commission's interim policy was retroactively deemed a draft without substantive justification for the change in status. Substantive Rehearing Order at P.34 n.101, J.A.-__.

significance of the project's reasonably foreseeable [greenhouse gas] emissions."

Substantive Rehearing Order at P. 1 (Chairman Glick, concurring), J.A.-__.

Finally, with regard to the Project's inconsistency with state and local climate laws, Petitioner informed the Commission that it

> failed to meaningfully consider how the requirements of
> the New York Climate Leadership and Community
> Protection Act and New York City's ban on gas usage in
> new construction will impact future need over the useful
> life of this project's infrastructure … The Commission
> itself has noted that reliance upon precedent agreements
> alone is insufficient and that it must consider all relevant
> factors bearing on the need for a project. The very real
> effect of the [Climate Act] on the project's future need is
> exactly such a factor, and [the Commission's] failure to
> consider it renders the Certificate unlawful.

Rehearing Request at 4–5, J.A.-__. In response, the Commission claimed that

"while the [Climate] Act includes targets and goals, it does not prescribe any

method or means for meeting these goals." Substantive Rehearing Order at PP. 16–

17, J.A.-__. Thus, the Commission "continue[d] to find that the . . . Climate Act

does not undermine our finding that Tennessee has demonstrated a need for the

project through a precedent agreement for 100% of the project's capacity." *Id.* at

PP. 16–17, J.A.-__. As a result, the Commission based its finding of need solely

upon a single precedent agreement between Tennessee and ConEd while

disregarding state and local climate law requirements that will materially impact

present and future need. *Id.*

## SUMMARY OF ARGUMENT

Through a series of decisions, this Court has clearly established that NEPA requires the Commission to review indirect and cumulative effects of the projects it approves or provide legitimate reasons as to why it cannot do so. Despite this, the Commission failed to fully analyze the indirect and cumulative upstream impacts of the Project, as well as the significance of those impacts on climate change. The Commission's failure to adequately analyze these impacts and their significance is arbitrary and capricious and violates NEPA. The Commission also failed to assess and consider the indirect and cumulative downstream air pollution impacts of the Project, including on ozone pollution in Westchester County, New York, as well as the significance of downstream environmental impacts on climate change. The Commission's failure to adequately review downstream air pollution and the significance of downstream impacts is arbitrary and capricious and violates NEPA.

The NGA further requires the Commission to consider all factors bearing on the public interest in its analysis of whether a project is required by the public convenience and necessity. Despite clear enforceable legislative mandates to reduce greenhouse gas emissions and fossil fuel reliance, the Commission failed to consider New York's Climate Act and New York City's prohibition on new gas connections for new and renovated buildings when determining that the Project is

required by the present and future public convenience and necessity. This failure is arbitrary and capricious, not based on substantial evidence, and violates the NGA.

The ordinary remedy for unlawful agency action is vacatur, and this case is no exception. Remand without vacatur would allow Tennessee to continue constructing the Project while the Commission seeks to remedy its numerous failures, even though that may result in a different outcome.

## STANDING

Petitioner Food & Water Watch has standing to challenge the Commission's approval of the Project. Petitioner is a non-profit membership organization that seeks to ensure access to clean drinking water, safe and sustainable food, and a livable climate. Petitioner's members live, work, and recreate in areas that will be affected by the construction and operation of the Project. *See* Decls. of Jo Ann Doran, Mitch Jones, Kristy Kasserman, Jeffery Keida, Kelly Kessler, Megan McDonough, and Natalie Polvere.

As a member-based nonprofit organization, Petitioner has standing if "(1) at least one of its members would have standing to sue in [their] own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)). Here, Petitioner's claims are germane to its associational purpose of environmental protection, including a focus on the cessation of fossil fuel extraction and combustion, *see* Decl. of Mitch Jones at P. 6–11, and do not require the participation of individual members in the lawsuit. *See Sierra Club v. Fed. Energy Regul. Comm'n*, 827 F.3d 36, 43 (D.C. Cir. 2016). Thus, the only remaining question is of individual-member standing. *See id.*

An individual has standing if they can demonstrate "(i) an injury in fact, (ii) that is fairly traceable to the challenged conduct, and (iii) that is likely to be redressed by a favorable decision." *Food & Water Watch v. Fed. Energy Regul. Comm'n,* 28 F.4th 277, 283 (D.C. Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Petitioner's declarants meet all three of these criteria. Members Jo Ann Doran and Jeffrey Keida each own homes within close proximity to Project construction sites in New Jersey, and thus both are subject to and concerned about the negative health, financial, and other quality-of-life impacts of the Project. *See* Decl. of Jo Ann Doran at PP. 1–2, Decl. of Jeffrey Keida, at PP. 18–20. Member Natalie Polvere will be subject to the downstream effects of the Project, as it will impact the already-degraded air quality around her home in Westchester County, New York. *See* Decl. of Natalie Polvere at PP. 35–37. As a ConEd ratepayer, the Project may also affect her financially. *See id*. Members Kristy Kasserman and Megan McDonough will be subject to the Project's upstream impacts, as it will lead to more well drilling and fracking near where they recreate and live in Pennsylvania. *See* Decl. of Kristy Kasserman at PP. 15–16; Decl. of Megan McDonough at PP. 29–30. These harms satisfy the injury-in-fact requirement. *See Food & Water Watch*, 28 F.4th at 283–84 (finding Petitioner Food & Water Watch's declarants satisfied the injury-in-fact element by demonstrating similar harms).

Petitioner's members also satisfy the causation and redressability elements of individual standing. Their injuries are directly attributable to the Commission's inadequate review and approval of the Project and can be redressed by vacating the Certificate Order and remanding to the Commission. *See id.* (finding that Petitioner Food & Water Watch's declarant satisfied the causation and redressability elements because their injuries were directly linked to the Commission's authorization and reversal would provide redress); *Sierra Club,* 867 F.3d at 1365–66 (stating that vacating and remanding a Commission order was sufficient for redressability). Therefore, Petitioner has standing to sue.

## <u>STANDARD OF REVIEW</u>

This Court's review is governed by the APA, which requires a reviewing court to set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also*, *Sithe/Indep. Power Partners, L.P. v. Fed. Energy Regul. Comm'n*, 165 F.3d 944, 948 (D.C. Cir. 1999) (stating "[w]e review [Commission] orders under the [APA's] arbitrary and capricious standard.") (citing *Union Pac. Fuels, Inc. v. Fed. Energy Regul. Comm'n*, 129 F.3d 157, 161 (D.C. Cir. 1997)). Under the arbitrary and capricious standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 471 U.S. 156, 168 (1962)). A reviewing court must find an agency action arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

The APA governs NEPA challenges. *Sierra Club*, 867 F.3d at 1367. Agency action under NEPA that fails to include "sufficient discussion" of the issues or fails to demonstrate "reasoned decisionmaking" is arbitrary and capricious. *Id.* at 1368. Moreover, agency action is contrary to law under NEPA if the agency relies upon conclusory statements that are unsupported by data, authorities, or explanatory information. *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) (citing *Nat. Res. Def. Council v. Grant*, 355 F. Supp. 280, 287 (E.D.N.C. 1973)). Moreover, "[s]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985).

Under the NGA, only findings of fact supported by substantial evidence are entitled to deference. 15 U.S.C. § 717r(b) ("the finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive"). Where the

Commission has neglected pertinent facts or "refus[ed] to come to grips" with evidence in the record, its decision cannot withstand judicial review. *Tenneco Gas v. Fed. Energy Regul. Comm'n*, 969 F. 2d 1187, 1214 (D.C. Cir. 1992).

**ARGUMENT**

First, the Commission violated NEPA because it failed to: (i) consider the reasonably foreseeable upstream effects of the Project; (ii) consider the reasonably foreseeable downstream air pollution and its effects on Westchester County, New York; and (iii) determine the significance of the upstream and downstream effects on climate change. Second, the Commission violated the NGA because it failed to consider how state and local laws requiring greenhouse gas emissions reductions bear on the public interest and diminish the purported need for the Project. Third, the proper remedy in this case is vacatur and remand.

## I.   THE COMMISSION FAILED TO FULLY CONSIDER INDIRECT AND CUMULATIVE ENVIRONMENTAL IMPACTS AND THEIR SIGNIFICANCE AS REQUIRED BY NEPA

For over half a century, NEPA has served as a safeguard against agencies making uninformed decisions on projects that may have a significant impact on the environment. 42 U.S.C. §§ 4321–4370j. NEPA is intended to ensure that "environmental information is available to public officials and citizens *before decisions are made and before actions are taken*." 40 C.F.R. § 1500.1(b) (emphasis added). To ensure informed decision-making, when completing its environmental review, the Commission must consider all reasonably foreseeable direct, indirect, and cumulative impacts of the projects before it. 42 U.S.C. § 4332(2)(C) (requiring environmental impact statements); 40 C.F.R. § 1508.1(g)

26

(defining "effects or impacts" to include direct, indirect, and cumulative effects); *Sierra Club v.* 867 F.3d at 1371–72. Indirect effects are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.1(g)(2). The definition includes "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id*. Effects are "reasonably foreseeable" if they are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *EarthReports, Inc. v. Fed. Energy Regul. Comm'n*, 828 F.3d 949, 955 (D.C. Cir. 2016) (quoting *Sierra Club v. Fed. Energy Regul. Comm'n*, 827 F.3d 36, 47 (D.C. Cir. 2016)). Cumulative effects are those which "result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions …." 40 C.F.R. § 1508.1(g)(3).

Identifying and evaluating the climate change consequences of an action's greenhouse gas emissions is essential if NEPA is to provide for the full disclosure and informed decision-making for which it was intended. *See, e.g., Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (explaining that an environmental impact statement serves NEPA's purpose by ensuring that "relevant information will be made available to the larger audience that may also play a role

in both the decision-making process and the implementation of that decision."). In addition to simply calculating the estimated volume of upstream and downstream greenhouse gas emissions resulting from a project, the Commission is required "to include a discussion of the *'significance'* of" those emissions and their resultant impact on climate change. *See Sierra Club,* 867 F.3d at 1374 (emphasis added); *Vecinos para el Bienestar de la Comunidad Costera v. Fed. Energy Reg. Comm'n*, 6 F.4th 1321, 1327–30 (D.C. Cir. 2021).

The Commission's environmental review under NEPA is integral to its determination as to whether a project is in the public interest and required by the public convenience and necessity under the NGA. *See Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1331. A deficient NEPA review can render the Commission's determinations under the NGA deficient as well. *See id*. (finding that the Commission's determinations of public interest and necessity were "deficient to the extent that they relied on its [deficient] NEPA analyses of the projects' impacts on climate change and environmental justice communities").

As discussed further below, in approving the Project, the Commission failed to consider the full scope and significance of reasonably foreseeable upstream and downstream indirect and cumulative impacts. As a result, the Commission's issuance of the Certificate Order is arbitrary and capricious and violates NEPA.

A. **The Commission Failed to Consider Reasonably Foreseeable Indirect and Cumulative Upstream Effects**

In this case, the Commission failed to consider upstream effects that were reasonably foreseeable and causally connected to its approval of the Project. While Petitioner asserts that the Commission possessed sufficient information to assess upstream impacts, if the Commission believed it needed additional information, it was obligated to request it.

> i. *The Project will have reasonably foreseeable and causally connected indirect upstream environmental impacts that the Commission must consider.*

NEPA requires the Commission to consider indirect effects if they are reasonably foreseeable and causally connected. The Project's upstream effects on fossil methane gas production and its resulting greenhouse gas emissions are both. The Project—which will provide an additional 115,000 Dekatherms per day of methane gas capacity on Tennessee's existing 300 Line gas transmission pipeline system—will have reasonably foreseeable upstream impacts. Long-term maintenance of existing gas supply capacity, let alone increased capacity, fundamentally *requires* additional drilling due to the nature of gas well depletion. *See* Rehearing Request at 9–12, J.A.-__. Information before the Commission demonstrates that well production for fossil methane gas declines precipitously, with fracked shale wells—like Marcellus and Utica shale wells—declining nearly

29

seventy percent in their first year and more than eighty-five percent in their first

three years, requiring continual expansion of well drilling and extraction to even

maintain current usage.



**Figure 1. Monthly production profile, hyperbolic decline curve**
barrels per day

U.S. Energy Info. Admin., *Production Decline Curve Analysis in the Annual*

*Energy Outlook 2022*, https://www.eia.gov/analysis/drilling/curve_analysis/;

Rehearing Request at 9–11, J.A.-__. Common sense dictates that to increase the

volume of gas supplied to ConEd's distribution system for the precedent

agreement's twenty years, not to mention the entire lifespan of this project's

infrastructure, additional production would be required upstream—this is simple

cause and effect.

Petitioner repeatedly urged the Commission to consider these upstream

impacts, and in providing its expert advice, EPA agreed, explaining that "upstream

[greenhouse gas] emissions *are reasonably foreseeable*." EPA Comments on the

Draft Environmental Impact Statement (Aug. 23, 2021), J.A. __ (emphasis added).

EPA even provided guidance on how the Commission could perform upstream

reviews: "[s]imilar to how the [Draft Environmental Impact Statement] estimates

downstream combustion, [the Commission] can use default assumptions to provide

this important missing information [on upstream impacts] to decisionmakers and

the public." *Id*. EPA explained that "[o]mitting consideration of upstream

emissions would result in an underestimation of the proposal's indirect impacts."

*Id*. As a result, the Commission would lack sufficient information on "the

reasonably foreseeable significant adverse impacts of the proposed action essential

to make an informed decision." *Id*.

     Despite this foreseeability, the Commission refused to calculate or consider

the reasonably foreseeable upstream impacts, including greenhouse gas emissions,

resulting from its approval of this Project's increased pipeline capacity and

additional purchased gas volumes. Citing no binding court precedent, the

Commission claimed that "[t]he environmental effects resulting from natural gas

production are generally neither caused by a proposed pipeline project nor are they

reasonably foreseeable consequences of our approval of an infrastructure project

…where the supply source is unknown." Substantive Rehearing Order at P. 27,

J.A. __. The Commission made this assertion despite having openly admitted to

this Court that upstream gas production and its associated greenhouse gases are, in

31

fact, indirect effects of a gas pipeline project where the effects are foreseeable and

causally connected. *Birckhead v. Fed. Energy Regul. Comm'n*, 925 F.3d 510, 517

(D.C. Cir. 2019) (stating that, at oral argument, "the Commission conceded that

there may well be instances in which upstream gas production is both reasonably

foreseeable and sufficiently causally connected to a pipeline project to qualify as

an indirect effect.").

The Commission claimed that it disregarded the reasonably foreseeable

upstream impacts of this Project because "where an agency has no ability to

prevent a certain effect due to its limited statutory authority over the relevant

actions, the agency cannot be considered a legally relevant 'cause' of the effect."

Substantive Rehearing Order at P. 26, J.A.-__. The Commission's argument is

misplaced. This Court has directly addressed this very assertion, finding that the

Commission "*is* a 'legally relevant cause' of the direct and indirect environmental

effects of pipelines it approves—*even where it lacks jurisdiction over the producer*

or distributor of the gas transported by the pipeline." *Birckhead*, 925 F.3d at 520

(citing *Sierra Club*, 867 F.3d at 1373) (emphasis added). This is only logical,

because the Commission can "deny a pipeline certificate on the ground that the

pipeline would be too harmful to the environment," thus preventing the associated

growth inducing effects of pipeline construction or expansion. *See id*. In this

instance, the Commission has the ability to prevent additional upstream production

of 115,000 Dekatherms of gas per day by denying certification of this Project even though its statutory authority does not extend to the regulation of upstream extraction.[4] Thus, the Commission should have considered the reasonably foreseeable and causally connected indirect upstream environmental impacts of the Project.

>    ii.  *The Commission had sufficient information to consider upstream impacts.*

While the Commission claimed that the Project's gas sources were unknown, Substantive Rehearing Order at P. 27, J.A.-__, it had sufficient information to make informed assumptions about upstream effects that are reasonably foreseeable and causally connected to the Project approval. *See Sierra Club,* 867 F.3d at 1374. It is well understood that "some educated assumptions are inevitable in the NEPA process." *Id.* Moreover, even if there is uncertainty about an issue before an agency, it does not excuse the agency from considering it, as "[t]he mere fact that the magnitude of [an effect] is *uncertain* is no justification for

---

[4] The Commission's implied assumption that this Project's additional volume of gas would be used elsewhere even in the event of a certification denial is unsupported. The White House Council on Environmental Quality recognizes that this "perfect substitution" rationale does not comply with NEPA's requirements. *See* Council on Env't Quality, *Nat'l Env't Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change,* 88 Fed. Reg. 1196, 1205 (Jan. 9, 2023).

*disregarding* the effect entirely." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) (emphasis in original).

While the Commission asserted that the Project's planned gas sourcing was unknown, both the Commission and this Court have previously acknowledged that the 300 Line, which will be upgraded by the Project, was specifically developed to facilitate extraction within the Marcellus Shale region of Pennsylvania. *Tenn. Gas Pipeline Co.*, 139 FERC ¶ 61,161 at P. 180–81 (May 29, 2012) (stating the Commission "consider[ed] the general development of the Marcellus Shale region in the vicinity of the project" when approving the expansion of the 300 Line and "identifie[d] that 1,454 Marcellus Shale wells were drilled in Pennsylvania in 2010 and approximately 1,740 wells would be drilled in 2011."); *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1308 (D.C. Cir. 2014) (stating "[t]he 300 Line carries natural gas from wells in western Pennsylvania to points of delivery east of Mahwah, New Jersey."). Moreover, Tennessee Gas President Norman G. Holmes explicitly stated in publicly available promotional materials that the 300 Line provided its gas "*primarily from the Marcellus Shale.*" Kinder Morgan, *Tennessee Gas Pipeline Places 300 Line Project in Service* (Nov. 1, 2011), https://ir.kindermorgan.com/news/news-details/2011/Tennessee-Gas-Pipeline-Places-300-Line-Project-in-Service/default.aspx (emphasis added). In this instance, the Project's own developer has publicly stated—and the Commission

and this Court have acknowledged—the 300 Line's primary source; yet the Commission still claimed that gas sources were unknown for this Project's expansion of that very same pipeline.

Here, it is clear that upstream producers will need to provide an additional 115,000 Dekatherms of gas daily to supply the Project; that upstream production of gas will need to occur if Tennessee wishes to provide an increased volume of gas over the useful life of the Project's infrastructure; that production will predominantly occur in Pennsylvania's Marcellus and Utica shales directly upstream on Tennessee's existing 300 Line; and that fossil fuel extraction results in greenhouse gas emissions and environmental impacts.

The Commission's claim that it lacks sufficient detail to provide even the most basic calculations of upstream greenhouse gas inventories is undercut by the efforts of multiple state and federal agencies that have estimated upstream greenhouse gas emissions based upon historical federal data and existing statistical models. Rehearing Request at 11, J.A. __. EPA's comments confirmed that with available information, the Commission could easily make reasonable estimates of upstream impacts and greenhouse gas emissions based upon well averages and information available through the Energy Information Administration, EPA, and other state and federal agencies. EPA, Comments on the Draft Environmental Impact Statement (Aug. 23, 2021), J.A. __. In fact, other agencies have

demonstrated the ability to do so. For example, the New York State Department of

Environmental Conservation uses federal data and models to estimate historical

upstream greenhouse gas emissions for fossil fuel projects and forecasts future

upstream emissions based upon those figures. N.Y.S. Dep't of Env't Conserv.,

*NYSDEC 2022 Statewide GHG Emission Inventory: Appendix*,

https://www.dec.ny.gov/docs/administration_pdf/ghgappxclcpaemissfctrs22.pdf.

New York's approach was built off of available lifecycle models from the National

Renewable Energy Laboratory and has been used to make upstream greenhouse

gas estimates in other pipeline proceedings before the Commission. *See, e.g.*,

Iroquois Gas Transmission System, L.P., Supplemental Filing, Docket No. CP20-

48-000, Doc. Accession No. 20211015-5198 (Oct. 15, 2021). Resources and

models are available to estimate upstream environmental impacts and other

governmental entities have shown their utility; yet the Commission continues to

shirk its responsibility under NEPA.

       iii.  *If the Commission believed it lacked information about upstream impacts, it was required to request more detailed information.*

Lacking information to fully consider upstream environmental impacts does

not excuse the Commission from considering them altogether. This Court has

recently reiterated that, before the Commission may conclude forecasting indirect

effects is impossible, NEPA "requires the Commission to at least *attempt* to obtain

the information necessary to fulfill its statutory responsibilities." *Food & Water Watch,* 28 F.4th at 286 (quoting *Birckhead*, 925 F.3d at 520) (emphasis in original); Rehearing Request at 12, J.A.-__. Moreover, the Commission may not ignore reasonably foreseeable indirect effects (*e.g.*, drilling emissions) "when the *nature* of the effect is reasonably foreseeable, but its *extent* is not." *See*, *e.g.*, *Mid States Coal. for Progress v. Surface Transp. Bd*., 345 F.3d 520, 549 (8th Cir. 2003) (emphasis in original). Here, the Commission approved the Project without acquiring information it believed it lacked to make an informed decision as to the scope of indirect upstream effects.

Petitioner specifically requested that the Commission seek additional information on upstream gas sourcing, but the Commission claimed that doing so would be futile. *See* Food & Water Watch, Comments on the Environmental Assessment at 3 (Mar. 22, 2021), J.A.-__; Food & Water Watch, Comments on the Draft Environmental Impact Statement at 3 (Aug. 23, 2021), J.A.-__; Rehearing Request at 11–12, J.A.- __; Certificate Order at P. 57, J.A.-__ ("[G]as to be transported via the East 300 Upgrade Project is currently unknown and may change throughout the project's operation"); Substantive Rehearing Order at P. 27, J.A.-__. However, this Court has found the Commission's prior claims concerning the futility of seeking more detailed information on upstream impacts to be highly dubious. *Birckhead*, 925 F.3d at 520 (quoting oral argument where counsel for

37

Tennessee stated "[w]hen the regulator asks us questions … we generally answer them as promptly as possible and as completely as possible.").

Rather than issue a supplemental data request to Tennessee, the Commission simply assumed the information was unknowable. Certificate Order at P. 57, J.A.-__; Substantive Rehearing Order at P. 27, J.A.-__ (claiming the project configuration somehow precluded obtaining information regarding upstream environmental impacts). As such, the Commission did not seek further information or more detailed explanations of upstream sourcing from Tennessee, Kinder Morgan, or upstream contracted producers. The Commission's failure to obtain additional information is especially puzzling here given Tennessee is a subsidiary of the largest gas transmission pipeline company in America; as such, it should have extensive data on the sourcing of gas within its massive pipeline network and the ability to obtain information from upstream shippers in production areas.

This Court must "reject any attempt by [the Commission] to shirk [its] responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info., Inc. v. U.S. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973). Rather, the Commission's failure to consider reasonably foreseeable upstream impacts of this Project, including greenhouse gas emissions, over Petitioner's objections and against the expert recommendation of the EPA, is arbitrary and capricious and

38

violates NEPA. *See State Farm*, 463 U.S. at 43 (explaining that agency action is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency").

### B. The Commission Failed to Consider Reasonably Foreseeable Indirect and Cumulative Downstream Air Pollution

As discussed *supra*, the Commission is obligated under NEPA to analyze the indirect and cumulative effects of the projects seeking its approval.[5] A unanimous D.C. Circuit decision recently held that when a project's gas goes to a local distribution company for usage—as is the case here—its downstream emissions are reasonably foreseeable and the Commission is required to quantify and assess their resultant impacts, or explain why it cannot do so. *Food & Water Watch,* 28 F.4th at 289.

Moreover, federal courts have made clear that an agency "must consider any foreseeable downstream air quality impacts as part of its NEPA analysis," including from both greenhouse gases and non-greenhouse gas pollution. *Western Org. of Res. Councils v. U. S. Bureau of Land Mgmt.*, 2022 U.S. Dist. LEXIS

---

[5] Even prior to the passage of NEPA, the Commission recognized, based on Supreme Court precedent, that downstream end-use and air pollution are within its purview. *Transwestern Pipeline Co*., 36 F.P.C. 176, 185 (1966) (stating that the "end use of gas was properly of concern to [the Commission], and [the Supreme Court] made it clear that air pollution was a relevant consideration…." (citing *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp*., 365 U.S. 1 (1961)))

138980, *21 (D. Mont. 2022); *see also*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) (holding that the Bureau of Land Management acted arbitrarily and capriciously when it failed to take a hard look at the direct, indirect, and cumulative impacts of drilling permits' greenhouse gas emissions and the cumulative impacts of hazardous air pollution); *WildEarth Guardians v. Bernhardt*, 2021 U.S. Dist. LEXIS 20792 (D. Mont. 2021) (vacating a mining plan because the Office of Surface Mining failed to take a hard look at the indirect effects of fossil fuel transportation and downstream air pollution).

The indirect effects of the Project at issue here include the foreseeable downstream air pollution caused by the significant increase in gas volumes moved into the local distribution network of Westchester County, New York, and the combustion of that gas. Westchester County is in noncompliance with the Clean Air Act's National Ambient Air Quality Standards for ozone, a byproduct of methane combustion, and increased gas shipment to the County stands to exacerbate its ozone pollution. Rehearing Request at 12, J.A.-__. The Commission acknowledged that ozone, a Clean Air Act criteria pollutant due to its adverse public health impacts, is a result of volatile organic compound pollution and downstream fossil fuel combustion. Substantive Rehearing Order at PP. 29–31, J.A.-__. The Commission also acknowledged that due to downstream combustion,

this Project will result in increased volatile organic compounds, nitrous oxides, and ozone. *Id.* at P. 29, J.A.-__.

However, the Commission shirked its obligations under NEPA by failing to fully consider indirect downstream air pollution impacts. In the Final Environmental Impact Statement, the Commission addressed the Project's direct volatile organic compound emissions and their impact on ozone levels for National Ambient Air Quality Standards non-attainment areas near the Project's compressor station sites. Final Environmental Impact Statement at 59, J.A.-__. Yet, the Commission refused to do the same for downstream airsheds where effects would be far greater and impact environmental justice communities. While the Commission claimed that it provided sufficient review of air pollution by calculating localized direct air pollution, "the fact that local emissions . . . do not exceed the [National Ambient Air Quality Standards] says nothing about the indirect effects of downstream combustion." *WildEarth Guardians v. Zinke*, 2019 U.S. Dist. LEXIS 30357, *24 (D. Mont. 2019) (finding that the Office of Surface Mining violated NEPA for failing to take a hard look at the indirect air pollution effects of fossil fuel transportation and combustion).

Here, the Commission violated NEPA because it failed to consider the effects of downstream ozone pollution, even though NEPA analyses "necessarily involve[] some 'reasonable forecasting,' and agencies may sometimes need to

41

make educated assumptions above an uncertain future." *Sierra Club*, 867 F.3d at

1374 (citing *Del. Riverkeeper Network*, 753 F.3d at 1310). After Petitioner alerted

the Commission to the shortcomings of its air pollution review, the Commission

provided post hoc estimates of downstream volatile organic compounds (a

precursor to ozone pollution) and nitrous oxide air pollution in its denial of the

Rehearing Request. Substantive Rehearing Order at P. 30 n.85, J.A.-__. But the

Commission stopped there. Despite providing ozone calculations for direct

emissions near compressor station sites, the Commission refused to provide a

range of possible ozone pollution resulting from the Project's downstream volatile

organic compound emissions and failed to consider how this increased air pollution

may impact local air quality and compliance with National Ambient Air Quality

Standards. The Commission ultimately refused to take these air pollution factors

into account, labeling them as too speculative. *Id.* at PP. 29–32, J.A.-__. The

Commission did so despite ample guidance from EPA on how to assess ozone

pollution through air quality modeling. *See*, *e.g.,* EPA, *Support Center for*

*Regulatory Atmospheric Modeling*, https://www.epa.gov/scram.

    The Commission's failure to fully consider downstream air pollution could

have broader implications. The Clean Air Act requires states to take action to

improve air quality, reduce air pollution, and prevent significant deterioration in

non-attainment areas through issuance of pollution permits. 42 U.S.C. §§ 7401–

7515. However, here the Commission is foisting a large volume of additional

downstream emissions from methane combustion upon a non-attainment area

without considering how it may impact New York's Clean Air Act implementation

plan for Westchester County. *See id.* § 7506. Moreover, as ConEd's distribution

grid largely serves small residential and commercial customers, the additional

emissions avoid any form of new source review permitting, even though this

Project's 115,000 Dekatherms of gas per day would have an aggregate emissions

volume akin to projects requiring facility permits under the Clean Air Act.[6] As a

result of the Commission's approval of this Project, the emissions equivalent of

locating a gas power plant in a non-attainment area is moving forward without any

meaningful downstream air quality review for Westchester County.

    The Commission claims that providing a range of potential ozone pollution

increases would be of "limited utility" because many variables are in play for

determining downstream air pollution. Substantive Rehearing Order at PP. 29–31,

J.A.-__. However, this Court has already recognized that indirect downstream

emissions are reasonably foreseeable even where the NEPA analysis "depend[s] on

several uncertain variables." *Sierra Club*, 867 F.3d at 1374. Moreover, the

---

[6] For example, We Energies' gas-powered Valley Power Plant in Milwaukee, Wisconsin, requires 25,000 Dekatherms of gas per day for a 272-megawatt electricity generating capacity. We Energies, *Valley Power Plant* (May 2016) https://www.we-energies.com/company/pdf/ValleyPP.pdf. The Project at issue here would ship nearly five times that volume.

Commission regularly provides ranges of possible impacts for a variety of other metrics in its environmental reviews. Commissioner Danly noted in his concurrence that there is nothing inherently more speculative about calculating a range of downstream criteria pollutants when compared to determining downstream greenhouse gas volumes, for which review is already required by NEPA and this Court. Substantive Rehearing Order at P. 16 (Comm'r Danley, concurring), J.A.-__ (asking "[a]re the Commission's calculations of downstream [greenhouse gas] emissions not similarly based on 'assumptions, each of which would potentially introduce errors'?"); *see generally*, *Sierra Club*, 867 F.3d 1357; *Food & Water Watch,* 28 F.4th 277.

The Commission is required to consider indirect and cumulative downstream air pollution, and its failure to do so here is arbitrary and capricious and violates NEPA. *See State Farm*, 463 U.S. at 43.

### C.  **The Commission Failed to Consider the Significance of the Project's Indirect and Cumulative Impacts on Climate Change**

In addition to simply calculating the estimated volume of indirect greenhouse gas emissions resulting from a project, the Commission is required "to include a discussion of *the 'significance' of*" those emissions and their resultant impact on climate change. *Sierra Club,* 867 F.3d at 1374 (emphasis added); *see also*, *Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1327–30. Despite this requirement, the Commission refused to assess significance here

because it is "conducting a generic proceeding to determine whether and how the

Commission will conduct significance determinations going forward." Certificate

Order at P. 49, J.A.-__. However, this separate proceeding and expected future

action does not excuse the Commission's legal obligation to evaluate the

significance of this Project's emissions.

     Prior to approving the Project, the Commission issued new gas certification

and greenhouse gas review policies which confirmed that it can, in fact, assess the

significance of a project's greenhouse gases and that such consideration is vital to

informed decision-making. *See* Fed. Energy Regul. Comm'n, *Certification of New*

*Interstate Nat. Gas Facilities*, Docket No. PL18-1-000, 178 FERC ¶ 61,107 (Feb.

18, 2022); Fed. Energy Regul. Comm'n, *Consideration of Greenhouse Gas*

*Emissions in Gas Infrastructure Project Revs.*, Docket No. PL21-3-000, 178 FERC

¶ 61,108 (Feb. 18, 2022). Well after the issuance of these policies, the Commission

retroactively labeled them as draft.[7] The Commission has since failed to finalize

---

[7] While an agency may change its position, it must provide a "good reason" and a
"detailed justification" to support its conclusion—something it has not done in this
proceeding or in others. *See Wisconsin Valley Improvement Co. v. Fed. Energy*
*Regul. Comm'n*, 236 F.3d 738, 748 (D.C. Cir. 2001) (stating "an agency acts
arbitrarily and capriciously when it abruptly departs from a position it previously
held without satisfactorily explaining its reason for doing so."). Moreover, "such
'good reason' requires more than 'nodding to [commenters'] concerns . . . only to
dismiss them in a conclusory manner'"—as the Commission has done here. *See*
*District of Columbia v. U.S. Dep't of Agric.*, 496 F. Supp. 3d 213, 239 (D.D.C.
2020) (citing *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020)).

these policies for over a year while still approving numerous gas projects with similar NEPA deficiencies. *See, e.g., Transcontinental Gas Pipe Line Co., L.L.C.,* 182 FERC ¶ 61,006 (Jan. 11, 2023). Despite being marked draft after issuance, these policies still demonstrate the Commission's legal requirement and ability to conduct a significance analysis. Future action (or inaction) on them has no bearing on the Commission's obligations in this proceeding.[8]

Here, the Commission categorically refused to consider the significance of the Project's greenhouse gas emissions despite it possessing, among other figures, the total volumes of annual direct and indirect downstream greenhouse gas emissions, information on the Project's percentage of state emissions (both present and future projections based upon emissions reductions goals), the estimated social cost of carbon, and information on U.S. emissions targets and associated carbon budgets established by the Biden administration and agreed to in the Paris Agreement. The Commission possessed copious data on the Project's impacts and had the ability to consider its contribution to climate change, yet failed to do so.

---

[8] Petitioner is complying with its obligations in this proceeding by seeking judicial review of the Commission's actions with regard to this Project in accordance with the NGA. *See* 15 U.S.C. § 717r(e). The NGA does not provide Petitioner with the opportunity to challenge the Commission's flawed analysis here again if or when the "generic proceeding" concludes and neither the Commission nor this Court will be able to remedy the flaws at that time.

Chairman Glick made clear in his concurrence that "there is nothing about [greenhouse gas] emissions or their contribution to climate change that prevents this agency from making determinations about their significance." Certificate Order at P. 7 (Chairman Glick, concurring), J.A.-__. Even if the Commission lacked some information, "the administration of NEPA is rife with judgment calls, and agencies necessarily must use the best tools and information at hand, caveating them as appropriate." *Id.* at P. 5, J.A.-__. Chairman Glick further noted that in this case the Commission already had sufficient information to make an informed determination related to the significance of this Project's impacts on climate change. *Id.* at PP. 4–8, J.A.-__.

The Commission further claimed "it lacked a methodology to determine significance." Certificate Order at P. 67, J.A.-__. However, this is a stark and unexplained reversal from the Commission's position in prior proceedings that it can indeed assess the significance of a project's greenhouse gas emissions. The Commission has previously explained that

> [i]n evaluating whether an impact is significant, the Commission determines whether 'it would result in a substantial adverse change in the physical environment.' In making that determination for different environmental impacts, the Commission necessarily considers different types of evidence, giving that evidence such weight as it deems appropriate using its experience, judgment, and expertise. We find that there is nothing about [greenhouse gas] emissions or their resulting contribution to climate

47

> change that prevents us from making that same type of
> significance determination.

*N. Nat. Gas. Co*., 174 FERC ¶ 61,189, at P. 32 (Mar. 22, 2021) (internal citations

omitted). Though the Commission acknowledged in a footnote that its Certificate

Order deviated from its prior precedent, it provided no substantive justification for

doing so. Certificate Order at P. 49, n.93, J.A.-__.

In sum, the Commission is required to consider reasonably foreseeable

indirect and cumulative impacts, and their significance on climate change, yet it

failed to do so here. This failure renders the Certificate Order arbitrary and

capricious and violates NEPA. *State Farm*, 463 U.S. at 43 (1983). Moreover, the

Commission's deficient NEPA review of the project undermines its determination

that the project is in the public interest under the NGA. *See Vecinos para el*

*Bienestar de la Comunidad Costera*, 6 F.4th at 1331.

## II.   THE COMMISSION VIOLATED THE NGA WHEN IT FAILED TO CONSIDER ALL FACTORS BEARING ON THE PUBLIC INTEREST, INCLUDING STATE AND LOCAL CLIMATE LAWS, IN ITS ANALYSIS OF PROJECT NEED

Under Section 7 of the NGA, the Commission may only approve

applications that, after considering "*all* factors bearing on the public interest," *Atl.*

*Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959) (emphasis

added), are *required* by the public convenience and necessity. 15 U.S.C. § 717f(e).

All other applications must be denied. *Id*. To ensure that it only approves projects

*required* by the public interest, when determining the project need, the

Commission must consider whether the project facilitates "orderly development"

and "protect[s] consumers against exploitation at the hands of natural gas

companies." *See Minisink Residents for Env't Pres. & Safety v. Fed. Energy Regul.*

*Comm'n*, 762 F.3d 97, 101 (D.C. Cir. 2014) (citing *NAACP v. Fed. Power*

*Comm'n,* 425 U.S. 662, 669–70 (1976); *Fed. Power Comm'n v. Hope Nat. Gas*

*Co*., 320 U.S. 591, 610 (1944)). Along with those main objectives, the Commission

also considers "'conservation, environmental, and antitrust' issues" when

reviewing project need under the NGA. *Pub. Utils. Comm'n of Cal. v. Fed. Energy*

*Regul. Comm'n*, 900 F.2d 269, 281 (D.C. Cir. 1990) (citing *NAACP*, 425 U.S. at

670 n.6).

Here, the Commission relied solely on a single precedent agreement to

justify its finding of public convenience and necessity. Certificate Order at P. 17,

J.A.-__. As the Commission itself has noted, reliance upon precedent agreements

alone is not necessarily sufficient to demonstrate project need. Fed. Energy Regul.

Comm'n, *Certification of New Interstate Natural Gas Facilities*, Docket No. PL18-

1-000, 178 FERC ¶ 61,107, at P. 54 (Feb. 18, 2022) (recognizing that "the

existence of precedent agreements may not be sufficient in and of themselves to

establish need for the project."). While precedent agreements are "important

evidence of demand for a project," "there is a difference between saying that

precedent agreements are always *important* versus saying that they are always *sufficient* to show that construction of a proposed new pipeline 'is or will be required by the present or future public convenience and necessity.'" *Env't Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 972, (D.C. Cir. 2021) (quoting 15 U.S.C. § 717f(e)).

Furthermore, the Commission must support determinations under the NGA with "substantial evidence." 15 U.S.C. § 717r(b). Where the Commission has neglected pertinent facts or "refus[ed] to come to grips" with evidence in the record, its order cannot withstand judicial review. *Tenneco Gas*, 969 F. 2d at 1214.

In this case, the Commission categorically ignored clear factors bearing on project need, as well as ratepayer and environmental protection, when it relied solely upon a single precedent agreement and refused to consider relevant state and local climate laws. The Commission's disregard of relevant factors bearing on the public interest is arbitrary and capricious, not based on substantial evidence, and violates the NGA. *See State Farm*, 463 U.S. at 43; *Tenneco Gas*, 969 F. 2d at 1214.

### A. The Commission Failed to Consider New York's Climate Leadership and Community Protection Act's Emissions Reduction Requirements

The Climate Act, N.Y. ENV'T CONSERV. LAW §§ 75-0101 to 75-0119, is a factor that bears on the public interest and the Commission's determination of project need. The statute itself expressly *requires* statewide economy-wide

reductions in greenhouse gas emissions of forty percent below 1990 levels by 2030, and eighty-five percent below 1990 levels by 2050. *Id.* § 75-0107(1). The Project's expansion of fossil fuel infrastructure for the purposes of expanding gas service is categorically inconsistent with any pathway to these greenhouse gas reductions.

The Climate Act includes specific enforceable requirements for reducing greenhouse gas emissions, sets clear emissions reduction targets, establishes a process for reporting and accountability, and includes enforcement provisions and penalties for noncompliance. *Id.* §§ 75-0101 to 75-0119. New York regulators have informed the Commission in other dockets that these reductions "are statutory mandates, not merely goals or targets." N.Y.S. Dep't of Env't Conserv., Comments Opposing Extension Request and Motion to Reopen Record, Docket No. CP15-115, Doc. Accession No. 20220216-5191, at 15 (Feb. 16, 2022) ("New York Comments Opposing Extension"). In addition, a state court has already upheld agencies' authority under the Climate Act to act in accordance with its requirements, even prior to completion of an action plan or regulatory framework. *Danskammer Energy, L.L.C., v. N.Y.S. Dep't of Env't Conserv.*, 2022 NYLJ LEXIS 1213 (N.Y. Sup. Ct. 2022) (holding that the Department of Environmental Conservation has the authority to deny a permit that is inconsistent or interferes with the Climate Act). Therefore, the Climate Act is a relevant factor bearing on

the public interest that the Commission should have considered when assessing the Project's future need.

In refusing to consider the Climate Act, the Commission claimed that the New York State Department of Environmental Conservation is responsible for enforcing the prescribed emissions targets and that the Climate Act does not expressly prohibit ConEd from providing gas service. As such, the Commission believes it may ignore these requirements when determining need, despite their clear relevance. Certificate Order at P. 19, J.A.-__.

Put simply, the Climate Act will dramatically reduce the need for gas in New York. As state regulators directly told the Commission, the Climate Act plan anticipates that "[a]s New York's economy becomes more efficient and electrified, end-use gas demand declines significantly, with reductions ranging from 83-95% by 2050." *See* New York Comments Opposing Extension at 21 n.16 (quoting N.Y.S. Action Council Integration Analysis Technical Supplement, Appendix G at 24 (Dec. 2022), https://climate.ny.gov/-/media/project/climate/files/Appendix-G.pdf). In comments to the Commission on its gas certification policy proceedings, the New York State Department of Environmental Conservation made clear that the "State needs to continue its ongoing transition away from natural gas and other fossil fuels" and recommended the Commission evaluate natural gas infrastructure projects in light of Climate Act requirements. N.Y.S. Dep't of Env't Conserv.,

Comments on the Updated Policy Statement on Certification of New Interstate Natural Gas Facilities, Docket No. PL18-1-000, Doc. Accession No. 20220425-5369 (Apr. 25, 2022). In addition, the scoping plan for implementing the Climate Act explicitly states that achieving the mandated reductions "will require a substantial reduction of fossil natural gas use and a strategic downsizing of the gas system." N.Y.S. Climate Action Council, *Scoping Plan: Full Report* at 20 (Dec. 2022) https://climate.ny.gov/-/media/project/climate/files/NYS-Climate-Action-Council-Final-Scoping-Plan-2022.pdf.[9] Moreover, Petitioner alerted the Commission that New York is already experiencing a downward trajectory for gas demand. Gas usage by New York's residential and commercial consumers fell for the three years prior to the Commission's certificate issuance, with 2021 being the lowest year since peak gas usage in 2016. Rehearing Request at 5, J.A.-__.

However, the Commission largely ignored the Climate Act and the evidence of declining demand, despite the clear relevance of these factors when determining the Project's need. The Commission's refusal to consider the Climate Act also fails to protect ratepayers if (or when) this Project's investments become stranded assets due to New York's strategic downsizing of its gas system. If this project were to be decommissioned early or installed only to see the additional capacity not needed,

---

[9] The New York State Climate Action Council issued the draft scoping plan for the Climate Act's implementation in December 2021, prior to issuance of the Certificate Order, and thus was available for the Commission's review.

then captive ratepayers within ConEd's service territory would bear the burden of the Commission's failure to properly consider future necessity. This shortcoming directly impedes the Commission's long-held legislative mission to "protect consumers against exploitation at the hands of natural gas companies." *Hope Nat. Gas Co.*, 320 U.S. at 610.

Since the Commission is tasked with considering all factors relevant to the public interest and protecting ratepayers from corporate abuse, its refusal to consider the Climate Act when approving expanded fossil fuel capacity into the state is arbitrary and capricious, not based on substantial evidence, and violates the NGA.

### A. The Commission Failed to Consider New York City's Prohibition on Gas Connections for New and Renovated Buildings

Prior to issuance of the Commission's Certificate Order, New York City enacted legislation that prohibited nearly all new gas hookups for newly constructed or renovated buildings within city limits. N.Y.C. Admin. Code § 24-177.1. The law is intended to swiftly phase out gas usage within New York City buildings to achieve previously established citywide greenhouse gas emissions reduction goals of forty percent by 2030 and eighty percent by 2050 from 2005 levels. However, the Commission refused to consider this local legislation despite its reasonably foreseeable effects on present and future gas demand within the local distribution territory served by this Project.

The sole recipient of this Project's gas, ConEd, serves as the gas utility for both New York City and Westchester County. New York City receives most of the gas delivered through ConEd's distribution network—roughly eighty percent—with a much smaller portion of gas on its network serving Westchester County. As New York City implements its prohibition on gas connections, it will increasingly free up significant volumes of gas available on ConEd's distribution grid. New York City's aggressive decarbonization mandates will have a direct impact on ConEd's network demand and available gas capacity to serve Westchester County. The Commission should have considered New York City's local legislation, and its failure to do so puts ratepayers at risk of liability for stranded assets and "exploitation at the hands of natural gas companies." *Minisink Residents for Env't Pres. & Safety,* 762 F.3d at101. Yet the Commission refused to do so, thus rendering its consideration of all factors relevant to the public interest deficient.

Not only did the Commission refuse to consider this factor in its determination of need, it also refused to address Petitioner's raising of the issue in its rehearing request. Such a failure is categorically arbitrary and capricious. *PPL Wallingford Energy L.L.C. v. Fed. Energy Regul. Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (stating that an agency's "failure to respond meaningfully" to objections raised by a party renders its decision arbitrary and capricious. (quoting

*Canadian Ass'n of Petroleum Producers v. Fed. Energy Regul. Comm'n*, 254 F. 3d 289, 299 (D.C. Cir. 2001))).

The Commission is required to consider all relevant factors bearing on the public interest, yet it failed to do so here by ignoring state and local climate laws that will dramatically decrease demand and, in turn, need for the Project. The Commission's deficient public interest determination is arbitrary and capricious, not based on substantial evidence, and violates the NGA.

## III. THE PROPER REMEDY IS VACATUR OF THE CERTIFICATE ORDER AND REMAND

"The ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)); *Fed. Commc'ns Comm'n v. NextWave Personal Commc'ns. Inc*., 537 U.S. 293, 300 (2003) ("In all cases agency action must be set aside if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or if the action failed to meet statutory, procedural, or constitutional requirements." (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971))). Vacatur is also the "standard remedy" in this Circuit for an "action promulgated in violation of NEPA." *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)); *see also*, *Reed v. Salazar*, 744 F. Supp. 2d 98, 118–20 (D.D.C. 2010) (finding NEPA violation and ordering

vacatur); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 204–05, 210 (D.D.C. 2008) (finding NEPA violation and ordering vacatur); *Pub. Emps. for Env't Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016) (surveying "cases in this district" and noting "the primacy of vacatur to remedy NEPA violations").

This case is no exception to vacatur as the standard remedy. In *Sierra Club,* an analogous case, this Court vacated a Commission order for failure to consider similar indirect effects of gas transmission infrastructure, even where construction had begun. *Sierra Club*, 867 F.3d at 1379. This result governs here. Remand without vacatur would allow Tennessee to continue constructing the Project while the Commission seeks to remedy the deficiencies, even though that may result in a different outcome.

## <u>CONCLUSION AND REFLIEF REQUESTED</u>

WHEREFORE, for the foregoing reasons, Petitioner Food & Water Watch respectfully requests that this Court vacate the Commission's orders issuing the Certificate and approving construction for the East 300 Upgrade Project, and remand them to the Commission for further proceedings consistent with the Court's opinion.

Respectfully submitted,

/s/ *Adam S. Carlesco*
Adam S. Carlesco
D.C. Bar No.:  1601151
FOOD & WATER WATCH
1616 P St., NW, Suite 300
Washington, D.C. 20036
202.683.4925
acarlesco@fwwatch.org

/s/ *Dan Greenhouse*
Dan Greenhouse
EASTERN ENVIRONMENTAL LAW CENTER
One Gateway Center, Suite 2600
Newark, New Jersey 07102
973.424.1166
dgreenhouse@easternenvironmental.org

/s/ *Erin E. Doran*
Erin E. Doran
FOOD & WATER WATCH
1616 P Street NW, Suite 300
Washington, D.C. 20036
202.683.2451
edoran@fwwatch.org

*Counsel for Petitioner*

Dated: March 14, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with (1) the type-volume limitations of Rule 32(a)(7) because it contains 12,742 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

/s/ *Adam S. Carlesco*

Adam S. Carlesco

*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of March, 2023, I electronically filed the foregoing Petitioner's Initial Brief with the Clerk of the Court using the CM/EF system, which will send notice of such filing to all registered CM/ECF users.


<u>/s/ *Adam S. Carlesco*</u>

Adam S. Carlesco

*Counsel for Petitioner*

## <u>ADDENDUM TABLE OF CONTENTS</u>

### <u>Statutes</u>

5 U.S.C. § 706 ................................................................1

15 U.S.C. § 717f ..............................................................3

15 U.S.C. § 717r ..............................................................9

42 U.S.C. § 4332 .............................................................14

42 U.S.C. § 7506 .............................................................18

N.Y. Envt'l Conserv. Law § 75-0107 .........................................32

### <u>Regulations</u>

18 C.F.R. § 385.214 ..........................................................34

18 C.F.R. § 385.713 ..........................................................38

40 C.F.R. § 1500.1 ...........................................................41

40 C.F.R. § 1501.5 ...........................................................43

40 C.F.R. § 1508.1 ...........................................................46

N.Y.C. Admin. Code § 24-177.1................................................54

*5 USCS § 706, Part 1 of 4*

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service  >  TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 —*

*13146)  >  Part I. The Agencies Generally (Chs. 1 — 10)  >  CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)  contrary to constitutional right, power, privilege, or immunity;

(C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)  without observance of procedure required by law;

(E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [*5 USCS §§ 556* and *557*] or otherwise reviewed on the record of an agency hearing provided by statute; or

**Add. 1**

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## History

**HISTORY:**

Sept. 6, 1966, *P. L. 89-554*, § 1, *80 Stat. 393*.

United States Code Service

Copyright © 2023 All rights reserved.

End of Document

### *15 USCS § 717f*

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service  >  TITLE 15. COMMERCE AND TRADE (Chs. 1 — 121)  >  CHAPTER 15B. NATURAL GAS (§§ 717 — 717z)*

## § 717f. Construction, extension, or abandonment of facilities

**(a) Extension or improvement of facilities on order of court; notice and hearing.**   Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

**(b) Abandonment of facilities or services; approval of Commission.**   No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after

**Add. 3**

due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

**(c) Certificate of public convenience and necessity.**

   **(1)**

   **(A)**  No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on the effective date of this amendatory Act, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after the effective date of this amendatory Act. Pending the determination of any such application, the continuance of such operation shall be lawful.

   **(B)**  In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be

prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

**(2)**  The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of—

   **(A)**  natural gas sold by the producer to such person; and

   **(B)**  natural gas produced by such person.

**(d) Application for certificate of public convenience and necessity.**   Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

**(e) Granting of certificate of public convenience and necessity.**   Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing

**Add. 5**

properly to do the acts and to perform the service proposed and to conform to the provisions of the Act [*15 USCS §§ 717* et seq.] and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the isssuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

**(f) Determination of service area; jurisdiction of transportation to ultimate customers.**

  **(1)**  The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

  **(2)**  If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

**(g) Certificate of public convenience and necessity for service of area already being served.**  Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and

**Add. 6**

necessity for service of an area already being served by another natural-gas company.

**(h) Right of eminent domain for construction of pipelines, etc.**   When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

## History

**HISTORY:**

June 21, 1938, ch 556, § 7, *52 Stat. 824*; Feb. 7, 1942, ch 49, *56 Stat. 83*; July 25, 1947, ch 333, *61 Stat. 459*; Nov. 9, 1978, *P. L. 95-617*, Title VI, § 608, *92 Stat. 3173*; Oct. 6, 1988, *P. L. 100-474*, § 2, *102 Stat. 2302.*

Copyright © 2023 All rights reserved.

**End of Document**

## *15 USCS § 717r*

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service > TITLE 15. COMMERCE AND TRADE (Chs. 1 — 121) > CHAPTER 15B. NATURAL GAS (§§ 717 — 717z)*

## § 717r. Rehearing and review

**(a) Application for rehearing; time.** Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this Act [*15 USCS §§ 717* et seq.] to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this Act [*15 USCS §§ 717* et seq.].

**(b) Review of Commission order.** Any party to a proceeding under this Act [*15 USCS §§ 717* et seq.] aggrieved by an order issued by the Commission in such

**Add. 9**

proceeding may obtain a review of such order in the [circuit] court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in *section 2112 of title 28, United States Code* [*28 USCS § 2112*]. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which if supported by substantial evidence, shall be conclusive, and its recommendations, if any, for the modification or setting aside of the original

order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended [*28 USCS § 1254*].

**(c) Stay of Commission order.**   The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review.**

   **(1)**  In general. The United States Court of Appeals for the circuit in which a facility subject to section 3 or section 7 [*15 USCS § 717b* or *717f*] is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (*16 U.S.C. 1451* et seq.).

   **(2)**  Agency delay. The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the

Coastal Zone Management Act of 1972 (*16 U.S.C. 1451* et seq.), for a facility subject to section 3 or section 7 [*15 USCS § 717b* or *717f*]. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 15(c) [16 USCS § 717n(c)] shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3)** Court action. If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 3 or section 7 [*15 USCS § 717b* or *717f*], the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4)** Commission action. For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5)** Expedited review. The Court shall set any action brought under this subsection for expedited consideration.

## History

**HISTORY:**

June 21, 1938, ch 556, § 19, *52 Stat. 831*; Aug. 28, 1958, *P. L. 85-791*, § 19, *72 Stat. 947*; Aug. 8, 2005, *P. L. 109-58*, Title III, Subtitle C, § 313(b), *119 Stat. 689*.

United States Code Service

Copyright © 2023 All rights reserved.

---

**End of Document**

**Add. 13**

*42 USCS § 4332, Part 1 of 2*

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)  >*

*CHAPTER 55. NATIONAL ENVIRONMENTAL POLICY (§§ 4321 — 4370m-12)  >  POLICIES AND GOALS (§§ 4331 — 4335)*

## § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act [*42 USCS §§ 4321* et seq.], and (2) all agencies of the Federal Government shall—

(A)  utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;

(B)  identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act [*42 USCS §§ 4341* et seq.], which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations;

(C)  include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

**Add. 14**

**(i)**  the environmental impact of the proposed action,

**(ii)**  any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)**  alternatives to the proposed action,

**(iv)**  the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)**  any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by *section 552 of title 5, United States Code*, and shall accompany the proposal through the existing agency review processes;

**(D)**  Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)**  the State agency or official has statewide jurisdiction and has the responsibility for such action,

**Add. 15**

**(ii)**  the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)**  the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)**  after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act [*42 USCS §§ 4321* et seq.]; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [;]

**(E)**  study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)**  recognize the worldwide and longrange character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

Add. 16

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by title II of this Act [*42 USCS §§ 4341* et seq.].

**History**

---

**HISTORY:**

Jan. 1, 1970, *P. L. 91-190*, Title I, § 102, *83 Stat. 853*; Aug. 9, 1975, *P. L. 94-83*, *89 Stat. 424*.

United States Code Service

Copyright © 2023 All rights reserved.

---

**End of Document**

**Add. 17**

## *42 USCS § 7506*

Current through Public Law 117-327, approved December 27, 2022, with a gap of Public Law 117-263.

*United States Code Service > TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164) >*

*CHAPTER 85. AIR POLLUTION PREVENTION AND CONTROL (§§ 7401 — 7675) > PROGRAMS AND*

*ACTIVITIES (§§ 7401 — 7515) > PLAN REQUIREMENTS FOR NONATTAINMENT AREAS (§§ 7501 —*

*7515) > Nonattainment Areas in General (§§ 7501 — 7509a)*

## § 7506. Limitations on certain Federal assistance

**(a), (b) [Repealed]**

**(c) Activities not conforming to approved or promulgated plans.**

**(1)** No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 110 [*42 USCS § 7410*]. No metropolitan planning organization designated under *section 134 of title 23, United States Code*, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 110 [*42 USCS § 7410*]. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means—

**(A)** conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

**(B)** that such activities will not—

 **(i)** cause or contribute to any new violation of any standard in any area;

 **(ii)** increase the frequency or severity of any existing violation of any standard in any area; or

 **(iii)** delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

**(2)** Any transportation plan or program developed pursuant to title 23, United States Code, or the Urban Mass Transportation Act [*49 USCS §§ 5301* et seq.] shall implement the transportation provisions of any applicable implementation plan approved under this Act applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this Act. In particular—

 **(A)** no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under title 23, United States Code, or the Urban Mass Transportation Act [*49 USCS §§ 5301* et seq.], or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions

**Add. 19**

expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);

**(B)**  no metropolitan planning organization or other recipient of funds under title 23, United States Code, or the Urban Mass Transportation Act [*49 USCS §§ 5301* et seq.] shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan;

**(C)**  a transportation project may be adopted or approved by a metropolitan planning organization or any recipient of funds designated under title 23, United States Code, or the Urban Mass Transportation Act [*49 USCS §§ 5301* et seq.], or found in conformity by a metropolitan planning organization or approved, accepted, or funded by the Department of Transportation only if it meets either the requirements of subparagraph (D) or the following requirements—

**(i)**  such a project comes from a conforming plan and program;

**(ii)**  the design concept and scope of such project have not changed significantly since the conformity finding regarding the plan and program from which the project derived; and

**(iii)**  the design concept and scope of such project at the time of the conformity determination for the program was adequate to determine emissions.

**Add. 20**

**(D)**  Any project not referred to in subparagraph (C) shall be treated as conforming to the applicable implementation plan only if it is demonstrated that the projected emissions from such project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan.

**(E)**  The appropriate metropolitan planning organization shall redetermine conformity of existing transportation plans and programs not later than 2 years after the date on which the Administrator—

**(i)**  finds a motor vehicle emissions budget to be adequate in accordance with *section 93.118(e)(4) of title 40, Code of Federal R*egulations (as in effect on October 1, 2004);

**(ii)**  approves an implementation plan that establishes a motor vehicle emissions budget if that budget has not yet been determined to be adequate in accordance with clause (i); or

**(iii)**  promulgates an implementation plan that establishes or revises a motor vehicle emissions budget.

**(3)**  Until such time as the implementation plan revision referred to in paragraph (4)(C) is approved, conformity of such plans, programs, and projects will be demonstrated if—

**(A)**  the transportation plans and programs—

**(i)**  are consistent with the most recent estimates of mobile source emissions;

**(ii)** provide for the expeditious implementation of transportation control measures in the applicable implementation plan; and

**(iii)** with respect to ozone and carbon monoxide nonattainment areas, contribute to annual emissions reductions consistent with sections 182(b)(1) and 187(a)(7) [*42 USCS §§ 7511a(b)(6)*, *7512a(a)(7)*]; and

**(B)** the transportation projects—

**(i)** come from a conforming transportation plan and program as defined in subparagraph (A) or for 12 months after the date of the enactment of the Clean Air Act Amendments of 1990 [enacted Nov. 15, 1990], from a transportation program found to conform within 3 years prior to such date of enactment; and

**(ii)** in carbon monoxide nonattainment areas, eliminate or reduce the severity and number of violations of the carbon monoxide standards in the area substantially affected by the project.

With regard to subparagraph (B)(ii), such determination may be made as part of either the conformity determination for the transportation program or for the individual project taken as a whole during the environmental review phase of project development.

**(4)** Criteria and procedures for determining conformity.

**(A)** In general. The Administrator shall promulgate, and periodically update, criteria and procedures for determining conformity (except in the case of transportation plans, programs, and projects) of, and for keeping the Administrator informed about, the activities referred to in paragraph (1).

**(B)** Transportation plans, programs, and projects. The Administrator, with the concurrence of the Secretary of Transportation, shall promulgate, and periodically update, criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects.

**(C)** Civil action to compel promulgation. A civil action may be brought against the Administrator and the Secretary of Transportation under section 304 [*42 USCS § 7604*] to compel promulgation of such criteria and procedures and the Federal district court shall have jurisdiction to order such promulgation.

**(D)** The procedures and criteria shall, at a minimum—

**(i)** address the consultation procedures to be undertaken by metropolitan planning organizations and the Secretary of Transportation with State and local air quality agencies and State departments of transportation before such organizations and the Secretary make conformity determinations;

**(ii)** address the appropriate frequency for making conformity determinations, but the frequency for making conformity determinations on updated transportation plans and programs shall be every 4 years, except in a case in which—

**(I)** the metropolitan planning organization elects to update a transportation plan or program more frequently; or

**(II)** the metropolitan planning organization is required to determine conformity in accordance with paragraph (2)(E); and

**(iii)** address how conformity determinations will be made with respect to maintenance plans.

**(E)**  Inclusion of criteria and procedures in SIP. Not later than 2 years after the date of enactment of the SAFETEA-LU [enacted Aug. 10, 2005] the procedures under subparagraph (A) shall include a requirement that each State include in the State implementation plan criteria and procedures for consultation required by subparagraph (D)(i), and enforcement and enforceability (pursuant to *sections 93.125(c)* and *93.122(a)(4)(ii) of title 40, Code of Federal R*egulations) in accordance with the Administrator's criteria and procedures for consultation, enforcement and enforceability.

**(F)**  Compliance with the rules of the Administrator for determining the conformity of transportation plans, programs, and projects funded or approved under title 23 of the United States Code or the Federal Transit Act [*49 USCS §§ 5301* et seq.] to State or Federal implementation plans shall not be required for traffic signal synchronization projects prior to the funding, approval or implementation of such projects. The supporting regional emissions analysis for any conformity determination made with respect to a transportation plan, program, or project shall consider the effect on emissions of any such project funded, approved, or implemented prior to the conformity determination.

 **(5)**  Applicability. This subsection shall apply only with respect to—

**(A)**  a nonattainment area and each pollutant for which the area is designated as a nonattainment area; and

**(B)**  an area that was designated as a nonattainment area but that was later redesignated by the Administrator as an attainment area and that is required to develop a maintenance plan under section 175A [*42 USCS § 7505a*] with respect to the specific pollutant for which the area was designated nonattainment.

**(6)** Notwithstanding paragraph 5 [(5)], this subsection shall not apply with respect to an area designated nonattainment under section 107(d)(1) [*42 USCS § 7407(d)(1)*] until one year after that area is first designated nonattainment for a specific national ambient air quality standard. This paragraph only applies with respect to the national ambient air quality standard for which an area is newly designated nonattainment and does not affect the area's requirements with respect to all other national ambient air quality standards for which the area is designated nonattainment or has been redesignated from nonattainment to attainment with a maintenance plan pursuant to section 175(A) [*42 USCS § 7505a*] (including any pre-existing national ambient air quality standard for a pollutant for which a new or revised standard has been issued).

**(7)** Conformity horizon for transportation plans.

   **(A)** In general. Each conformity determination required under this section for a transportation plan under *section 134(i) of title 23, United States Code*, or *section 5303(i) of title 49, United States Code*, shall require a demonstration of conformity for the period ending on either the final year of the transportation plan, or at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, the longest of the following periods:

      **(i)** The first 10-year period of any such transportation plan.

      **(ii)** The latest year in the implementation plan applicable to the area that contains a motor vehicle emission budget.

**(iii)**  The year after the completion date of a regionally significant project if the project is included in the transportation improvement program or the project requires approval before the subsequent conformity determination.

**(B)**  Regional emissions analysis. The conformity determination shall be accompanied by a regional emissions analysis for the last year of the transportation plan and for any year shown to exceed emission budgets by a prior analysis, if such year extends beyond the applicable period as determined under subparagraph (A).

**(C)**  Exception. In any case in which an area has a revision to an implementation plan under section 175A(b) [*42 USCS § 7505a(b)*] and the Administrator has found the motor vehicles emissions budgets from that revision to be adequate in accordance with *section 93.118(e)(4) of title 40, Code of Federal R*egulations (as in effect on October 1, 2004), or has approved the revision, the demonstration of conformity at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, shall be required to extend only through the last year of the implementation plan required under section 175A(b) [*42 USCS § 7505a(b)*].

**(D)**  Effect of election. Any election by a metropolitan planning organization under this paragraph shall continue in effect until the metropolitan planning organization elects otherwise.

**(E)**  Air pollution control agency defined. In this paragraph, the term "air pollution control agency" means an air pollution control agency (as defined in section 302(b) [*42 USCS § 7602(b)*]) that is responsible for developing plans or controlling air pollution within the area covered by a transportation plan.

**(8)** Substitution of transportation control measures.

**(A)** In general. Transportation control measures that are specified in an implementation plan may be replaced or added to the implementation plan with alternate or additional transportation control measures—

**(i)** if the substitute measures achieve equivalent or greater emissions reductions than the control measure to be replaced, as demonstrated with an emissions impact analysis that is consistent with the current methodology used for evaluating the replaced control measure in the implementation plan;

**(ii)** if the substitute control measures are implemented—

**(I)** in accordance with a schedule that is consistent with the schedule provided for control measures in the implementation plan; or

**(II)** if the implementation plan date for implementation of the control measure to be replaced has passed, as soon as practicable after the implementation plan date but not later than the date on which emission reductions are necessary to achieve the purpose of the implementation plan;

**(iii)** if the substitute and additional control measures are accompanied with evidence of adequate personnel and funding and authority under State or local law to implement, monitor, and enforce the control measures;

**(iv)** if the substitute and additional control measures were developed through a collaborative process that included—

**(I)** participation by representatives of all affected jurisdictions (including local air pollution control agencies, the State air pollution control agency, and State and local transportation agencies);

**(II)** consultation with the Administrator; and

**(III)** reasonable public notice and opportunity for comment; and

**(v)** if the metropolitan planning organization, State air pollution control agency, and the Administrator concur with the equivalency of the substitute or additional control measures.

**(B)** Adoption.

**(i)** Concurrence by the metropolitan planning organization, State air pollution control agency and the Administrator as required by subparagraph (A)(v) shall constitute adoption of the substitute or additional control measures so long as the requirements of subparagraphs (A)(i), (A)(ii), (A)(iii) and (A)(iv) are met.

**(ii)** Once adopted, the substitute or additional control measures become, by operation of law, part of the State implementation plan and become federally enforceable.

**(iii)** Within 90 days of its concurrence under subparagraph (A)(v), the State air pollution control agency shall submit the substitute or additional control measure to the Administrator for incorporation in the codification of the applicable implementation plan. Nothwithstanding [Notwithstanding] any other provision of this Act, no additional State process shall be necessary to support such revision to the applicable plan.

**(C)**  No requirement for express permission. The substitution or addition of a transportation control measure in accordance with this paragraph and the funding or approval of such a control measure shall not be contingent on the existence of any provision in the applicable implementation plan that expressly permits such a substitution or addition.

**(D)**  No requirement for new conformity determination. The substitution or addition of a transportation control measure in accordance with this paragraph shall not require—

    **(i)**  a new conformity determination for the transportation plan; or

    **(ii)**  a revision of the implementation plan.

**(E)**  Continuation of control measure being replaced. A control measure that is being replaced by a substitute control measure under this paragraph shall remain in effect until the substitute control measure is adopted by the State pursuant to subparagraph (B).

**(F)**  Effect of adoption. Adoption of a substitute control measure shall constitute rescission of the previously applicable control measure.

**(9)**  Lapse of conformity. If a conformity determination required under this subsection for a transportation plan under *section 134(i) of title 23, United States Code*, or *section 5303(i) of title 49, United States Code*, or a transportation improvement program under section 134(j) of such title 23 or under section 5303(j) of such title 49 is not made by the applicable deadline and such failure is not corrected by additional measures to either reduce motor vehicle emissions sufficient to demonstrate compliance with the requirements of this subsection

within 12 months after such deadline or other measures sufficient to correct such failures, the transportation plan shall lapse.

**(10)** Lapse. In this subsection, the term "lapse" means that the conformity determination for a transportation plan or transportation improvement program has expired, and thus there is no currently conforming transportation plan or transportation improvement program.

**(d) Priority of achieving and maintaining national primary ambient air quality standards.** Each department, agency, or instrumentality of the Federal Government having authority to conduct or support any program with air-quality related transportation consequences shall give priority in the exercise of such authority, consistent with statutory requirements for allocation among States or other jurisdictions, to the implementation of those portions of plans prepared under this section to achieve and maintain the national primary ambient air quality standard. This paragraph extends to, but is not limited to, authority exercised under the Urban Mass Transportation Act [*49 USCS §§ 5301* et seq.], title 23 of the United States Code, and the Housing and Urban Development Act.

---
**History**
---

**HISTORY:**

July 14, 1955, ch 360, Title I, Part D, Subpart 1, § 176, as added Aug. 7, 1977, *P. L. 95-95*, Title I, § 129(b), *91 Stat. 749*; Nov. 16, 1977, *P. L. 95-190*, § 14(a)(59), *91 Stat. 1403*); Nov. 15, 1990, *P. L. 101-549*, Title I, §§ 101(f), 102(a)(1), 110(4), *104 Stat. 2409*, 2412, 2470; Nov. 28, 1995, *P. L. 104-59*, Title III, § 305(b), *109 Stat. 580*; Oct. 9, 1996, *P. L. 104-260*, *110 Stat. 3175*; Oct. 27, 2000, *P. L. 106-377*, § 1(a)(1), *114 Stat. 1441*; Aug. 10, 2005, *P. L. 109-59*, Title VI, § 6011(a)–(f), *119 Stat. 1878*.

United States Code Service

Copyright © 2023 All rights reserved.

---

**End of Document**

*NY CLS ECL § 75-0107*

Current through 2023 released Chapter 1

*New York Consolidated Laws Service > Environmental Conservation Law (Arts. 1 — 75) > Article 75 Climate Change (§§ 75-0101 — 75-0119)*

## § 75-0107. Statewide greenhouse gas emissions limits.

**1.** No later than one year after the effective date of this article, the department shall, pursuant to rules and regulations promulgated after at least one public hearing, establish a statewide greenhouse gas emissions limit as a percentage of 1990 emissions, as estimated pursuant to *section 75-0105* of this article, as follows:

**a.** 2030: 60% of 1990 emissions.

**b.** 2050: 15% of 1990 emissions.

**2.** Greenhouse gas emission limits shall be measured in units of carbon dioxide equivalents and identified for each individual type of greenhouse gas.

**3.** In order to ensure the most accurate determination feasible, the department shall utilize the best available scientific, technological, and economic information on greenhouse gas emissions and consult with the council, stakeholders, and the public in order to ensure that all emissions are accurately reflected in its determination of 1990 emissions levels.

**4.** In order to comply with the statewide greenhouse gas emissions limits promulgated pursuant to this section, a source may utilize the alternative compliance mechanism established pursuant to subdivision four of *section 75-0109* of this article. The use of such mechanism shall be in accordance with the provisions of that subdivision.

**Add. 32**

**History**

*L 2019, ch 106, § 2*, effective January 1, 2020.

New York Consolidated Laws Service

Copyright © 2023  Matthew Bender, Inc.,

a member of the LexisNexis (TM) Group All rights reserved.

**End of Document**

**Add. 33**

## *18 CFR 385.214*

This document is current through the Mar. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 14490, 88 FR 14887, and 88 FR 14893.

*Code of Federal Regulations  >  Title 18 Conservation of Power and Water Resources  >  Chapter I — Federal Energy Regulatory Commission, Department of Energy  >  Subchapter X — Procedural Rules  >  Part 385— Rules of Practice and Procedure  >  Subpart B — Pleadings, Tariff and Rate Filings, Notices of Tariff or Rate Examination, Orders to Show Cause, Intervention, and Summary Disposition*

## § 385.214 Intervention (Rule 214).

**(a)  Filing.**

**(1)** The Secretary of Energy is a party to any proceeding upon filing a notice of intervention in that proceeding. If the Secretary's notice is not filed within the period prescribed under Rule 210(b), the notice must state the position of the Secretary on the issues in the proceeding.

**(2)** Any State Commission, the Advisory Council on Historic Preservation, the U.S. Departments of Agriculture, Commerce, and the Interior, any state fish and wildlife, water quality certification, or water rights agency; or Indian tribe with authority to issue a water quality certification is a party to any proceeding upon filing a notice of intervention in that proceeding, if the notice is filed within the period established under Rule 210(b). If the period for filing notice has expired, each entity identified in this paragraph must comply with the rules for motions to intervene applicable to any person under paragraph (a)(3) of this section including the content requirements of paragraph (b) of this section.

Add. 34

**(3)** Any person seeking to intervene to become a party, other than the entities specified in paragraphs (a)(1) and (a)(2) of this section, must file a motion to intervene.

**(4)** No person, including entities listed in paragraphs (a)(1) and (a)(2) of this section, may intervene as a matter of right in a proceeding arising from an investigation pursuant to Part 1b of this chapter.

**(b)  Contents of motion.**

**(1)** Any motion to intervene must state, to the extent known, the position taken by the movant and the basis in fact and law for that position.

**(2)** A motion to intervene must also state the movant's interest in sufficient factual detail to demonstrate that:

**(i)** The movant has a right to participate which is expressly conferred by statute or by Commission rule, order, or other action;

**(ii)** The movant has or represents an interest which may be directly affected by the outcome of the proceeeding, including any interest as a:

**(A)** Consumer,

**(B)** Customer,

**(C)** Competitor, or

**(D)** Security holder of a party; or

**(iii)** The movant's participation is in the public interest.

**(3)** If a motion to intervene is filed after the end of any time period established under Rule 210, such a motion must, in addition to complying with paragraph (b)(1) of this section, show good cause why the time limitation should be waived.

**Add. 35**

**(c)  Grant of party status.**

**(1)** If no answer in opposition to a timely motion to intervene is filed within 15 days after the motion to intervene is filed, the movant becomes a party at the end of the 15 day period.

**(2)** If an answer in opposition to a timely motion to intervene is filed not later than 15 days after the motion to intervene is filed or, if the motion is not timely, the movant becomes a party only when the motion is expressly granted.

**(d)** Grant of late intervention. (1) In acting on any motion to intervene filed after the period prescribed under Rule 210, the decisional authority may consider whether:

**(i)** The movant had good cause for failing to file the motion within the time prescribed;

**(ii)** Any disruption of the proceeding might result from permitting intervention;

**(iii)** The movant's interest is not adequately represented by other parties in the proceeding;

**(iv)** Any prejudice to, or additional burdens upon, the existing parties might result from permitting the intervention; and

**(v)** The motion conforms to the requirements of paragraph (b) of this section.

**(2)** Except as otherwise ordered, a grant of an untimely motion to intervene must not be a basis for delaying or deferring any procedural schedule established prior to the grant of that motion.

**(3)**

**(i)** The decisional authority may impose limitations on the participation of a late intervener to avoid delay and prejudice to the other participants.

**Add. 36**

**(ii)** Except as otherwise ordered, a late intervener must accept the record of the proceeding as the record was developed prior to the late intervention.

**(4)** If the presiding officer orally grants a motion for late intervention, the officer will promptly issue a written order confirming the oral order.

## Statutory Authority

*Authority Note Applicable to 18 CFR Ch. I, Subch. X, Pt. 385*

## History

[47 FR 19022, May 3, 1982; 48 FR 746, Jan. 7, 1983.; 49 FR 21705, May 23, 1984; *68 FR 51070*, 51142, Aug. 25, 2003; *73 FR 62881*, 62886, Oct. 22, 2008]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2023 All rights reserved.

End of Document

*18 CFR 385.713*

This document is current through the Mar. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 14490, 88 FR 14887, and 88 FR 14893.

*Code of Federal Regulations  >  Title 18 Conservation of Power and Water Resources  >  Chapter I — Federal Energy Regulatory Commission, Department of Energy  >  Subchapter X —  Procedural Rules  >  Part 385— Rules of Practice and Procedure  >  Subpart G — Decisions*

## § 385.713 Request for rehearing (Rule 713).

**(a)  Applicability.**

**(1)** This section applies to any request for rehearing of a final Commission decision or other final order, if rehearing is provided for by statute, rule, or order.

**(2)** For the purposes of rehearing under this section, a final decision in any proceeding set for hearing under subpart E of this part includes any Commission decision:

**(i)** On exceptions taken by participants to an initial decision;

**(ii)** When the Commission presides at the reception of the evidence;

**(iii)** If the initial decision procedure has been waived by consent of the participants in accordance with Rule 710;

**(iv)** On review of an initial decision without exceptions under Rule 712; and

**(v)** On any other action designated as a final decision by the Commission for purposes of rehearing.

**(3)** For the purposes of rehearing under this section, any initial decision under Rule 709 is a final Commission decision after the time provided for Commission

review under Rule 712, if there are no exceptions filed to the decision and no review of the decision is initiated under Rule 712.

**(b)** Time for filing; who may file. A request for rehearing by a party must be filed not later than 30 days after issuance of any final decision or other final order in a proceeding.

**(c)** Content of request. Any request for rehearing must:

**(1)** State concisely the alleged error in the final decision or final order;

**(2)** Conform to the requirements in Rule 203(a), which are applicable to pleadings, and, in addition, include a separate section entitled "Statement of Issues," listing each issue in a separately enumerated paragraph that includes representative Commission and court precedent on which the party is relying; any issue not so listed will be deemed waived; and

**(3)** Set forth the matters relied upon by the party requesting rehearing, if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order.

**(d)  Answers.**

**(1)** The Commission will not permit answers to requests for rehearing.

**(2)** The Commission may afford parties an opportunity to file briefs or present oral argument on one or more issues presented by a request for rehearing.

**(e)** Request is not a stay. Unless otehwise ordered by the Commission, the filing of a request for rehearing does not stay the Commission decision or order.

**(f)** Commission action on rehearing. Unless the Commission acts upon a request for rehearing within 30 days after the request is filed, the request is denied.

**Statutory Authority**

*Authority Note Applicable to 18 CFR Ch. I, Subch. X, Pt. 385*

**History**

[47 FR 19022, May 3, 1982, as amended by 49 FR 21316, May 21, 1984; 60 FR 4860, Jan. 25, 1995, as corrected at *60 FR 16567*, Mar. 31, 1995; *70 FR 55723*, 55725, Sept. 23, 2005; *71 FR 14640*, 14642, Mar. 23, 2006]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2023 All rights reserved.

**End of Document**

### *40 CFR 1500.1*

This document is current through the Mar. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 14490, 88 FR 14887, and 88 FR 14893.

*Code of Federal Regulations  >  Title 40 Protection of Environment  >  Chapter V — Council on Environmental Quality  >  Subchapter A — National Environmental Policy Act Implementing Regulations  >  Part 1500 — Purpose and Policy*

## Notice

🚩. This section has more than one version with varying effective dates.

## § 1500.1 Purpose.

**(a)** The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

**(b)** NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important,

NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(**c**) Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## Statutory Authority

NEPA, the Environmental Quality Improvement Act of 1970, as amended (*42 U.S.C. 4371* et seq.), sec. 309 of the Clean Air Act, as amended (*42 U.S.C. 7609*) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

*Authority Note Applicable to 40 CFR Ch. V, Pt. 1500*

## History

[43 FR 55990, Nov. 28, 1978; *85 FR 43304*, 43357, July 16, 2020]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2023 All rights reserved.

End of Document

*40 CFR 1501.5*

This document is current through the Mar. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 14490, 88 FR 14887, and 88 FR 14893.

*Code of Federal Regulations  >  Title 40 Protection of Environment  >  Chapter V — Council on Environmental Quality  >  Subchapter A — National Environmental Policy Act Implementing Regulations  >  Part 1501 — Nepa and Agency Planning*

**Notice**

⚑. This section has more than one version with varying effective dates.

**§ 1501.5 Environmental assessments. [See Publisher's Note for the effective date.]**

[PUBLISHER'S NOTE: *85 FR 43304*, 43359, July 16, 2020, which revised Part 1501, provides: "This is a major rule subject to congressional review. The effective date is September 14, 2020. However, if congressional review has changed the effective date, CEQ will publish a document in the Federal Register to establish the actual effective date or to terminate the rule."]

**(a)** An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

**(b)** An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

**(c)** An environmental assessment shall:

(**1**) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(**2**) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

(**d**) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

(**e**) Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.

(**f**) The text of an environmental assessment shall be no more than 75 pages, not including appendices, unless a senior agency official approves in writing an assessment to exceed 75 pages and establishes a new page limit.

(**g**) Agencies may apply the following provisions to environmental assessments:

(**1**) Section 1502.21 of this chapter— Incomplete or unavailable information;

(**2**) Section 1502.23 of this chapter— Methodology and scientific accuracy; and

(**3**) Section 1502.24 of this chapter— Environmental review and consultation requirements.

**Statutory Authority**

NEPA, the Environmental Quality Improvement Act of 1970, as amended (*42 U.S.C. 4371* et seq.), sec. 309 of the Clean Air Act, as amended (*42 U.S.C. 7609*, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

*Authority Note Applicable to 40 CFR Ch. V, Pt. 1501*

## History

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979; *85 FR 43304*, 43359, July 16, 2020]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2023 All rights reserved.

**End of Document**

Add. 45

### *40 CFR 1508.1*

This document is current through the Mar. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 14490, 88 FR 14887, and 88 FR 14893.

*Code of Federal Regulations  >  Title 40 Protection of Environment  >  Chapter V — Council on Environmental Quality  >  Subchapter A — National Environmental Policy Act Implementing Regulations  >  Part 1508 — Definitions*

## § 1508.1 Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(**a**) Act or NEPA means the National Environmental Policy Act, as amended (*42 U.S.C. 4321*, et seq.).

(**b**) Affecting means will or may have an effect on.

(**c**) Authorization means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(**d**) Categorical exclusion means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment.

(**e**) Cooperating agency means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

**(f)** Council means the Council on Environmental Quality established by title II of the Act.

**(g)** Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following:

    **(1)** Direct effects, which are caused by the action and occur at the same time and place.

    **(2)** Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

    **(3)** Cumulative effects, which are effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time.

    **(4)** Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

**(h)** Environmental assessment means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of

whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

(**i**) Environmental document means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(**j**) Environmental impact statement means a detailed written statement as required by section 102(2)(C) of NEPA.

(**k**) Federal agency means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(***l***) Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4 of this chapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(**m**) Human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (See also the definition of "effects" in paragraph (g) of this section.)

(**n**) Jurisdiction by law means agency authority to approve, veto, or finance all or part of the proposal.

(**o**) Lead agency means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

**(p)** Legislation means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

**(q)** Major Federal action or action means an activity or decision subject to Federal control and responsibility subject to the following:

**(1)** Major Federal action does not include the following activities or decisions:

**(i)** Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

**(ii)** Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

**(iii)** Activities or decisions that do not result in final agency action under the Administrative Procedure Act or other statute that also includes a finality requirement;

**(iv)** Judicial or administrative civil or criminal enforcement actions;

**(v)** Funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds;

**(vi)** Non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project; and

**(vii)** Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance (for example, action does not include farm ownership and operating loan guarantees by the Farm Service Agency

**Add. 49**

pursuant to *7 U.S.C. 1925* and *1941* through *1949* and business loan guarantees by the Small Business Administration pursuant to *15 U.S.C. 636(a)*, *636(m)*, and *695* through *697g*).

**(2)** Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

**(3)** Major Federal actions tend to fall within one of the following categories:

**(i)** Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, *5 U.S.C. 551* et seq. or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

**(ii)** Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

**(iii)** Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

**(iv)** Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

**(r)** Matter includes for purposes of part 1504 of this chapter:

> **(1)** With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (*42 U.S.C. 7609*).

> **(2)** With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

**(s)** Mitigation means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

> **(1)** Avoiding the impact altogether by not taking a certain action or parts of an action.

> **(2)** Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

> **(3)** Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

> **(4)** Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

> **(5)** Compensating for the impact by replacing or providing substitute resources or environments.

**(t)** NEPA process means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

**(u)** Notice of intent means a public notice that an agency will prepare and consider an environmental impact statement.

**(v)** Page means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

**(w)** Participating agency means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

**(x)** Proposal means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

**(y)** Publish and publication mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this chapter.

**(z)** Reasonable alternatives means a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action.

**(aa)** Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

**(bb)** Referring agency means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

**(cc)** Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11 of this chapter).

**(dd)** Senior agency official means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

**(ee)** Special expertise means statutory responsibility, agency mission, or related program experience.

**(ff)** Tiering refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

## Statutory Authority

*Authority Note Applicable to 40 CFR Ch. V, Pt. 1508*

## History

[43 FR 56003, Nov. 29, 1978; *87 FR 23453*, 23469, Apr. 20, 2022]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2023 All rights reserved.

End of Document

*NYC Administrative Code  24-177.1*

**** Current through March 10, 2023 ****

*New York City Municipal Code, Charter and Rules  >  New York City Administrative Code  >  Administrative Code of the City of New York  >  Title 24 Environmental Protection and Utilities  >  CHAPTER 1 AIR POLLUTION CONTROL  >  SUBCHAPTER 8 FUEL STANDARDS**

## § 24-177.1  Prohibited emissions.

    a. Buildings shall be subject to the emission limits set forth in this section in accordance with section 28-506.1.

    b. No person shall permit the combustion of any substance that emits 25 kilograms or more of carbon dioxide per million British thermal units of energy, as determined by the United States energy information administration, within such building.

    c. Notwithstanding the prohibition in subdivision b, combustion of a substance that emits 25 kilograms of carbon dioxide per million British thermal units of energy or more shall be permitted for use within such a building where the combustion of such substance occurs in connection with a device that contains no connection to a building's gas supply line or fuel oil piping system, is used on an intermittent basis, and is not used to supply a building with heat or hot water.

    d. This section may be enforced by the department or the department of buildings.

### HISTORICAL NOTE

Section added L.L. 154/2021 §  1, eff. Dec. 22, 2021. [See Note 1]

**Note**

    1.

**Add. 54**

NYC Administrative Code 24-177.1

Provisions of L.L. 154/2021:

§ 4. a. The office of long-term planning and sustainability, in consultation with other relevant agencies or offices of the city, and with experts in the operation of heat pumps, engineers and architects, shall conduct a study regarding the use of heat pump technology in relation to the anticipated use of such technology in connection with the implementation of this local law. Such study may reference, or draw from, data collected during, or the results of, prior studies. Such study shall include, but need not be limited to, evaluations of the feasibility within the city, the feasibility based on building size for buildings less than seven stories and for buildings seven stories and more, cost of installation based on building size for buildings less than seven stories and for buildings seven stories and more, cost of use based on building size for buildings less than seven stories and for buildings seven stories and more, and   environmental impact of the use of the following technologies:

1. Centralized air source heat pumps with storage tanks;

2. Ground source heat pumps and multi-source heat pumps;

3. Solar thermal with storage tanks and air source heat pumps; and

4. On-demand electric water heaters, both with tank and tankless, whichever is applicable based on building size.

b. No later than June 1, 2023, the office of long-term planning and sustainability shall submit to the mayor and the speaker of the council, and make publicly available online, a report detailing the findings of the study conducted pursuant to this section.

§ 5. a. The office of long-term planning and sustainability, in consultation with other relevant agencies or offices of the city and with experts in the operation of electric

**Add. 55**

NYC Administrative Code  24-177.1

grids, shall conduct a study regarding the reliability and resiliency of the city's electrical distribution grid, and transmission lines into the city, in relation to the anticipated use of such grid and lines for the implementation of this local law. Such study may reference, or draw from, data collected during, or the results of, prior studies. Such study shall include, but need not be limited to, evaluations of:

1. The current and projected 2030 load on the electrical grid for both winter and summer, including (i) an identification of factors that may affect demand; (ii) specific recommendations regarding the capacity that could be added to the current energy supply to meet such projected demand after consideration of such factors; and (iii) actions the city could take in connection with such recommendations;

2. Projected 2030 transmission electricity flows into zone J of the NYISO electrical grid;

3. Projected 2030 load on the electrical grid due to anticipated electrification;

4. Opportunities to incentivize flexible loads to support grid resiliency and reliability; and

5. Recommendations for improved infrastructure coordination and planning to support electrification.

   b. No later than June 1, 2023, the office of long-term planning and sustainability shall submit to the mayor and the speaker of the council, and make publicly available online, a report detailing the findings of the study conducted pursuant to this section.

§ 6. This local law takes effect immediately.

Add. 56

NYC Administrative Code  24-177.1

NYCCDE

Copyright 2023 New York Legal Publishing Corporation a New York Corporation, All Rights Reserved

**End of Document**

**Add. 57**